**Henry QUINONES, M.D., Appellant,**

v.

**Tona PIN, Individually and as Next Friend of Tina Pin, an Incapacitated Person, and as Next Friend of Stacey Pin, Tiffany Pin and Tommy Pin, Minors, Appellee.**

**No. 05–09–00215–CV.**

Court of Appeals of Texas, Dallas.

Oct. 13, 2009.

Russell G. Thornton, Stinnett Thiebaud & Remington, L.L.P., Phillipa M. Remington, Dallas, TX, for Appellant.

Rodney Gappelberg, Fuqua & Gappelberg, L.L.P., Dallas, TX, for Appellee.

Before Justices O'NEILL, FRANCIS, and FILLMORE.

## OPINION

Opinion by Justice FILLMORE.

Appellant Henry Quinones, M.D. moved to dismiss this health care liability case, asserting that appellee had not provided a sufficient expert report as required by chapter 74 of the civil practice and remedies code. The trial court denied the motion, and Quinones perfected this interlocutory appeal. We conclude that the trial court did not abuse its discretion and accordingly affirm.

## I. BACKGROUND

### A. Factual allegations

Given the procedural posture of this case, we draw the facts from the allegations in appellee's live petition in the trial court. Quinones is an internist and nephrologist. Tina Pin was Quinones's patient. He diagnosed her as suffering from a kidney disease called focal segmental glomerulosclerosis (FSGS). As part of her treatment, he prescribed the drug Prednisone, a corticosteroid, in the amount of 60 mg per day. About two months after she began taking the Prednisone, she went to an emergency room complaining of pain, shortness of breath, and other problems. She was hospitalized, and her health deteriorated precipitously. Tests revealed that she was infected with a parasite called strongyloides. Pin was immuno-compromised by her use of Prednisone, and the strongyloides infection developed into a "hyperinfection syndrome." The parasite carried e-coli and other bacteria throughout her system. These bacteria penetrated her central nervous system, causing her to suffer profound, permanent, and incapacitating injuries.

### B. Procedural history

Pin's husband, Tona Pin, filed this lawsuit against Quinones. (We will refer to Tina Pin as "Pin" and Tona Pin as "appellee.") His sole legal theory is that Quinones did not obtain informed consent from Pin by disclosing all known material risks before beginning the Prednisone therapy. Appellee furnished a report and curriculum vitae of Harry Ginsberg, M.D., who is board certified in internal medicine, within the time permitted by chapter 74 of the civil practice and remedies code.

Quinones filed objections to the Ginsberg report and moved for dismissal of the case. He later filed amended objections to the report and again moved to dismiss. Appellee filed a written response to the amended objections in which he argued that the report was sufficient and alternatively requested a thirty-day extension of time to cure any defects. Quinones then filed his second amended objections to the report and again moved to dismiss. The trial judge held a hearing and signed an order denying Quinones's motion to dismiss. Quinones timely perfected this interlocutory appeal. We have jurisdiction under section 51.014(a)(9) of the civil practice and remedies code. *See Lewis v. Funderburk*, 253 S.W.3d 204, 207–08 (Tex. 2008) (interlocutory appeal is available when trial court denies a motion to dismiss based on the alleged inadequacy of a timely furnished report).

## II. STANDARD OF REVIEW

We review the trial court's determination of the sufficiency of an expert report for abuse of discretion. A trial court abuses its discretion by acting in an arbitrary or unreasonable manner without reference to guiding rules or principles.

We may not substitute our judgment for that of the trial court. However, a trial court has no discretion in determining what the law is or applying the law to the facts. A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Nexion Health at Terrell Manor v. Taylor*, 294 S.W.3d 787, 790–91 (Tex.App.-Dallas 2009, no pet. h.).

### III. ANALYSIS

Quinones raises three issues on appeal. In his first issue, he argues that Ginsberg is not qualified as an "expert" on the applicable standard of care under chapter 74. In his second issue, he argues that Ginsberg's report does not establish Quinones actually failed to obtain Pin's informed consent. In his third issue, he argues that Ginsberg's report is insufficient on the essential element of causation. We conclude that none of Quinones's issues has merit.

### A. Law governing expert reports

A plaintiff bringing a health care liability claim must serve the defendant with an expert report within 120 days after filing suit. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp. 2008). The statute defines "expert report" as follows:

> "Expert report" means a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding [1] applicable standards of care, [2] the manner in which the care rendered by the physician or health care provider failed to meet the standards, and [3] the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6) (bracketed numbering added). If the plaintiff does not do so, the defendant is entitled to dismissal of the case and an award of attorneys' fees and costs. *Id.* § 74.351(b).

■ Chapter 74 prescribes standards for qualifying an "expert" to render an expert report. When the defendant is a physician, as in this case, a proposed expert on the standard of care must be a physician who (1) is practicing medicine or was practicing medicine at the time the claim arose, (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim, and (3) is qualified based on training or experience to offer expert opinions about the accepted standards of medical care. *Id.* §§ 74.351(r)(5)(A), 74.401(a). The claimant bears the burden of showing that the witness is qualified as an expert. *Mosely v. Mundine*, 249 S.W.3d 775, 779 (Tex. App.-Dallas 2008, no pet.).

■ As to the substance of the report, we judge its sufficiency by examining only the report itself. *Nexion Health*, 294 S.W.3d at 790–91. A report is sufficient unless "it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report." TEX. CIV. PRAC. & REM.CODE ANN. § 75.351(*l*). To constitute an objective, good-faith effort, the report must inform the defendant of the specific conduct the plaintiff has called into question, and the report must provide a basis for the trial judge to conclude the claims have merit. *Nexion Health*, 294 S.W.3d at 790–91. Although the plaintiff need not marshal all his proof in the report, the report must adequately address each of the three elements required by the statute. *Id.* A report is deficient if it merely states the expert's conclusions about the elements. *Id.* "[T]he expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex.2002) (per curiam).

## B. Ginsberg's qualifications

■ Quinones argues first that Ginsberg's expert report and curriculum vitae do not show that he is qualified to render standard-of-care opinions in this case. More specifically, he argues that Ginsberg fails to qualify as an expert under section 74.401(a)(2), which requires the witness to have "knowledge of accepted standards of care for the diagnosis, care, or treatment *of the illness, injury, or condition involved in the claim.*" TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a)(2) (emphasis added). Quinones argues that the condition involved in this claim is the kidney disease FSGS, and that Ginsberg's report and curriculum vitae do not demonstrate that he has the required knowledge about the diagnosis, care, or treatment of that disease. Appellee argues that the relevant area of knowledge is knowledge about care and treatment using Prednisone therapy, not the care and treatment of FSGS. Appellee argues alternatively that Ginsberg is qualified even if the statute requires him to have knowledge about the care and treatment of FSGS.

■ The standard of care in informed-consent cases like this one is governed by statute. *See generally* TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.101–.107. Quinones asserts, and appellee does not dispute, that the Texas Medical Disclosure Panel has not specifically determined what risks or hazards must be disclosed prior to beginning Prednisone treatment. Accordingly, the applicable standard of care is that of "negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent." *Id.* § 74.101; *accord Baylor Univ. Med. Ctr. v. Biggs,* 237 S.W.3d 909, 914 & n. 3 (Tex.App.-Dallas 2007, pet. denied). The plaintiff must prove by expert testimony (1) "that the medical condition complained of is a risk inherent in the medical procedure performed" and (2) the "risk is material in the sense that it could influence a reasonable person's decision to consent to the procedure." *Biggs,* 237 S.W.3d at 914. Thus, in informed-consent cases the focus is less on the patient's pre-existing condition than on the risks inherent in the specific medical procedure or treatment being proposed to the patient. A physician who has sufficient specialized knowledge about those risks should be qualified to render opinions about the informed-consent standard of care for that procedure or treatment, even if he or she does not possess broader knowledge about whether that procedure or treatment is the best one based on the patient's particular condition. We think that this interpretation is consistent with the plain language of the statute: in an informed-consent case, the proposed expert must have knowledge of the informed-consent standard of care for the particular care or treatment recommended (in this case, Prednisone therapy) for the patient's illness, injury, or condition. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(a)(2).

*Biggs* supports our interpretation of the statute. In that case, a patient died after receiving a kidney transplant from a donor who was infected with rabies. 237 S.W.3d at 913. Her survivors sued the transplant surgeon who harvested the organ for not obtaining the recipient patient's informed consent regarding the donor's known risk factors. *Id.* The plaintiffs relied on a report from a doctor whose report and curriculum vitae stated that he was a nephrologist and a "transplant physician" but did not specifically state that he had training or experience either as a transplant surgeon or in obtaining informed consent from patients awaiting transplant surgery. *Id.* at 916. Nevertheless, we concluded that the trial court had not abused its discretion because the witness possessed

sufficient credentials in kidney-transplant medicine generally to satisfy section 74.401. *Id.* Although we did not make our reasoning explicit, it seems plain that we accepted the expert because he possessed expertise on the nature of the risks inherent in kidney-transplant surgery, even though it was not apparent from the report that the expert had performed transplant surgeries or obtained informed consents himself. Thus, if Ginsberg possesses adequate expertise on the nature of the risks inherent in Prednisone therapy, section 74.401 is satisfied even if he does not possess special expertise specifically on the treatment of FSGS.

In his report, Ginsberg establishes that he is a board-certified internist with experience in treating a wide variety of illnesses, diseases, and complaints. Regarding Prednisone, he states as follows:

> In my many years of practice I have had occasion to prescribe the drug known as Prednisone (a steroid) on many occasions, encompassing a wide variety of ailments. In my experience and professional career I estimate I have prescribed the medication Prednisone on hundreds of occasions and I am very familiar with the standard of care that exists concerning the care to be afforded patients when they are prescribed Prednisone.
>
> ... The use and knowledge of Prednisone as a prescribed medication is not limited to any one physician specialty or specialist, but rather is one of the most widely used and prescribed medications by almost all specialties and disciplines. ...
>
> I am familiar and knowledgeable with the standard of care to be utilized in prescribing Prednisone for a wide variety of ailments, diseases or conditions. Regardless of the specific condition at issue, the same standard of care applies.

> The standard of care involved in prescribing Prednisone, particularly in high doses and particularly for an extended period of time, does not vary from physician to physician or from specialty to specialty, but rather is the same for any physician of any specialty prescribing Prednisone for treatment of a condition.

Later in his report, Ginsberg explains that the standard of care for a physician prescribing Prednisone requires disclosure of the risks known to be associated with its use, especially the risk that the drug may decrease the patient's resistance to infections that may already be present in the patient or that the patient may contract in the future.

We conclude that Ginsberg establishes in his report that he has knowledge of the accepted standard of care for obtaining informed consent to the use of Prednisone, and that this standard does not vary according to the medical condition being treated. The trial court did not abuse its discretion by concluding that Ginsberg was qualified to opine about the standard of care.

## C. Sufficiency of the report to establish failure to obtain informed consent

In his second issue on appeal, Quinones argues that Ginsberg's report is insufficient because it does not establish that Quinones actually failed to obtain Pin's informed consent. Quinones points out that Ginsberg infers the failure to obtain informed consent because Pin's medical records do not show that Quinones "discussed any of the recognized or possible risks, hazards, warnings, cautions or adverse reactions" associated with Prednisone. This, according to Quinones, makes the report conclusory and insufficient. Appellee contends the report is sufficient because Ginsberg sets forth both his con-

clusion—that Quinones breached the standard of care by failing to obtain informed consent from Pin—and the facts on which he bases that conclusion. Appellee also argues that he cannot be compelled to furnish any additional evidentiary basis for his expert's conclusion when (1) Pin is brain-damaged and cannot communicate what Quinones told her and (2) the statute prohibits him from deposing Quinones, the only other party to the conversation, at this early stage of the litigation.

■ We agree with appellee that Ginsberg's report is sufficient as to the essential element of breach of the standard of care. The supreme court has explained that "a plaintiff need not present evidence in the report as if [he] were actually litigating the merits." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex.2001). "The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* With respect to the element of breach of the standard of care, the expert must set forth what care was expected but not given. *Id.* at 880. And, as previously noted, "the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Mem'l Hosp.*, 79 S.W.3d at 52. Ginsberg's report satisfies these requirements as to the element of breach of the standard of care. He relies on the silence of the medical records to infer that Quinones did not mention to Pin "any of the possible risks, hazards or side effects which could be caused by Prednisone." Then he concludes that Quinones failed to provide the appropriate standard of care when he prescribed this particular Prednisone therapy without disclosing the risks or hazards inherent therein, "most particularly with regard to masking infections or the appearance of new infections." His report explains the care that was required and not given in a nonconclusory way.

We find support for our conclusion in *Findley–Smith v. Smith*, No. 01–07–00360–CV, 2008 WL 525813 (Tex.App.-Houston [1st Dist.] Feb. 28, 2008, pet. denied) (mem. op.). The defendants in that case appealed the trial court's denial of their motion to dismiss challenging the sufficiency of the plaintiffs' reports. *Id.* at *1. They argued that the reports were not sufficient because the plaintiffs did not give their experts the complete medical records pertaining to the patients' care. *Id.* at *3. That is, like Quinones, they attacked the reports based on the quality of the evidence the experts used as the basis for their factual assumptions. The court of appeals held that this attack was improper, emphasizing that the expert-report inquiry is limited to the four corners of the report itself. *Id.* at *4. Permitting such attacks would put the trial court in the position of "deciding the merits of the case in summary judgment fashion, which *Palacios* prohibits." *Id.* We agree. In connection with a chapter 74 motion to dismiss, we are limited to the four corners of the report in assessing its sufficiency. *Nexion Health*, 294 S.W.3d at 790–91. Accordingly, Quinones's attack on the data underlying Ginsberg's opinion about breach of the standard of care is beyond the scope of a section 74.351(b) challenge.

The trial court did not abuse its discretion by rejecting Quinones's argument that Ginsberg did not adequately establish the element of breach of the standard of care.

### D. Sufficiency of the report on the element of causation

■ In his third issue, Quinones argues that Ginsberg's report is conclusory and insufficient as to the essential element of causation. Appellee disagrees.

To satisfy chapter 74, the expert report must include a fair summary of the expert's opinion regarding the causal relationship between the breach of the standard of care and the injury, harm, or damages claimed. *Biggs*, 237 S.W.3d at 922. In an informed-consent case, causation has two parts. The first part is whether a reasonable person could have been influenced, in deciding whether to give or withhold consent, by information concerning the risks and hazards that was not disclosed. *Id.* The second part is whether the injury complained of was caused in fact by the undisclosed risk. *Id.* Quinones argues that Ginsberg's report is insufficient as to both parts of the causation element.

### 1. The reasonable-person test

In his report, Ginsberg opines that a reasonable person could have been influenced in her decision-making concerning consent by a warning that Prednisone can mask existing or new infections:

> [I]t is my opinion, based on reasonable medical probability, that Dr. Quinones failed to provide the appropriate standard of care required to Mrs. Pin in prescribing Prednisone therapy 60 mg. daily for an extended period of time by failing to disclose such risks or hazards inherent, most particularly with regard to masking infections or the appearance of new infections that could have influenced her or any reasonable person in their decision as to whether to give their consent or withhold their consent to begin the Prednisone treatment.

The question presented is whether Ginsberg also gives enough factual explanation to render this opinion nonconclusory. The supreme court has identified a number of factors that can show that a risk is material, such as the probability of the adverse result, its severity, whether it is permanent or temporary, whether it has known cures, and the overall effect of the adverse result on the body. *Barclay v. Campbell*, 704 S.W.2d 8, 10 (Tex.1986). *Barclay* was decided under chapter 74's predecessor, article 4590i, but the pertinent statutory language has not changed, and we have continued to rely on it as good law. *E.g., Biggs*, 237 S.W.3d at 914–15.

Ginsberg states in his report that the most important risk to be disclosed in prescribing Prednisone is that the drug can mask some signs of infection and can lower a patient's resistance to new or latent infections. He states, "This is the most well known risk and recognized possible side effect of Prednisone and any physician prescribing Prednisone for treatment of a condition such as FSGS should warn the patient about the risks of infections first appearing or increasing in severity, or against taking it while the patient may be infected with some other infection." With regard to immunosuppression, Ginsberg opines:

> Most worrisome is the adverse reaction associated between Prednisone and small pox, chicken pox, measles, tuberculosis and strongyloides infection (threadworm).... By taking Prednisone, a steroid, the patient becomes immunosuppressed which reduces the ability of the body's immune system to counteract these infections and can cause the infection to increase in severity and as in the case of the Strongyloides worm, cause hyperinfection syndrome, where the worm multiplies exponentially and if it progresses to the central nervous system, can cause pronounced meningitis (brain infection).

Ginsberg does not go into great detail about the reasons the risk of immunosuppression was a material risk, but he does at least explain the overall effect that immunosuppression could have on the body, especially if the patient suffered from

strongyloides as Pin did. By explaining that use of Prednisone can cause hyperinfection and meningitis, Ginsberg also explains that the severity of the adverse side effect is very great. Although Ginsberg does not discuss the probability of these side effects, their permanence, or the existence of known cures, we conclude that he gave enough of a factual basis for his conclusion that a reasonable trial court could accept his opinion as nonconclusory.

## 2. Cause in fact

The second prong of causation is whether Pin's injury was actually caused in fact by the Prednisone therapy and the undisclosed risks of immunosuppression and the masking of infection. Ginsberg states as follows in his report:

> [W]ithin a short time after beginning Prednisone therapy[, Pin] developed symptoms consistent with E-coli bacteremia which culminated in E-coli meningitis. This means that the E-coli bacteria which normally live in the human digestive tract infected her bloodstream and traveled to her brain. This brain infection caused her to lapse into a coma and sustain brain damage. The likelihood that the E-coli infection became disseminated and spread to her brain was enhanced by her immunosuppressed state caused by her taking high dose Prednisone. If she had not taken Prednisone, she would not have become immunosuppressed and hence, her catastrophic course could have been avoided.

Quinones contends that this opinion is inadequate because (1) it is conclusory, and (2) it does not actually establish a but-for causal connection between Pin's use of Prednisone and her brain injury.

We reject Quinones's argument that Ginsberg's causation opinion is conclusory. He adequately explains the causal mechanism of the injury in terms of a specific factual causal chain. The use of the Pred-

nisone caused Pin to become immunosuppressed. The immunosuppression made it more likely that the E-coli in her digestive tract would become disseminated in her blood stream and travel to her brain. The E-coli caused her brain infection, which in turn caused her physical injuries. We approved a report that provided a similar amount of factual detail in *Mosely v. Mundine*, 249 S.W.3d 775, 780 (Tex.App.-Dallas 2008, no pet.). Quinones's argument is without merit.

■ Quinones's argument that Ginsberg's report does not establish but-for causation presents a closer issue. It is well settled that "a report's adequacy does not depend on whether the expert uses any particular 'magical words.'" *Bowie Mem'l Hosp.*, 79 S.W.3d at 53. Nevertheless, several courts have held that "[a] description of only a possibility of causation does not constitute a good-faith effort to comply with the statute." *Walgreen Co. v. Hieger*, 243 S.W.3d 183, 186 (Tex.App.-Houston [14th Dist.] 2007, pet. denied); *accord Alford v. Belacazar*, No. 13–07–00657–CV, 2008 WL 3868114, at *3 (Tex. App.-Corpus Christi Aug. 21, 2008, no pet.) (mem. op.); *McMenemy v. Holden*, No. 14–07–00365–CV, 2007 WL 4842452, at *5–6 (Tex.App.-Houston [14th Dist.] Nov. 1, 2007, pet. denied) (mem. op.); *Estate of Allen v. Polly Ryon Hosp. Auth.*, No. 01–04–00151–CV, 2005 WL 497291, at *5 (Tex. App.-Houston [1st Dist.] March 3, 2005, no pet.) (mem. op.). In a medical-malpractice case, the element of causation requires proof that the breach of the standard of care was, more likely than not, the cause of the injury. *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 400 (Tex.1993); *see also Lenger v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 706 (Tex.1970) (plaintiff must prove "at least a reasonable probability" that plaintiff's injuries were caused by defendant's negligence). Thus, courts

have reasoned that a report that describes causation in terms of mere possibilities does not accomplish the purpose of providing "a basis for the trial court to conclude that the claims have merit." *Bowie Mem'l Hosp.*, 79 S.W.3d at 52.

We focus our attention on the last sentence of Ginsberg's report: "If [Pin] had not taken Prednisone, she would not have become immunosuppressed and hence, her catastrophic course could have been avoided." In some contexts, the word "could" expresses only a mere possibility. *See McMenemy*, 2007 WL 4842452, at *6; *Estate of Allen*, 2005 WL 497291, at *5; *see also* THE NEW OXFORD AMERICAN DICTIONARY 389 (2001) (stating that "could" is "used to indicate possibility"). In such contexts, the word "could" means essentially the same thing as "might," as in the sentence "I could be wrong." But the word "could" has multiple meanings. As the past tense of "can," "could" refers to past ability. THE NEW OXFORD AMERICAN DICTIONARY at 249 (giving example "I could hear footsteps"); *see also* BLACK'S LAW DICTIONARY 218 (8th ed. 2004) (defining "can" as "To be able to do something"). When "could" is used to indicate past ability, it signifies neither conjecture nor speculation. Rather, it takes on essentially the same meaning as "would," as illustrated in a sentence such as "Either driver could have prevented the accident by obeying his four-way stop sign." If Ginsberg chose the word "could" to indicate past ability, then his report satisfies the element of causation because it shows a but-for causal nexus between the use of the Prednisone and Pin's ultimate injuries.

We conclude that a reasonable person could interpret Ginsberg's report to establish causation beyond mere possibility or conjecture. In his report, Ginsberg explains in detail that one risk of Prednisone therapy is suppression of the immune system, thus allowing preexisting infections, such as the strongyloides parasite, to increase in severity and eventually cause complications such as meningitis. Ginsberg asserts that Pin's medical records show that "within a short time after beginning Prednisone therapy she developed symptoms consistent with E-coli bacteremia which culminated in E-coli meningitis." Then he concludes that the use of Prednisone enhanced the likelihood that the E-coli infection would become disseminated and spread to her brain. Read in context, Ginsberg's conclusion that Pin's "catastrophic course could have been avoided" if she had not taken the Prednisone and become immunosuppressed seems to mean that Pin would have avoided her injuries if she had not taken the Prednisone. At the very least, a reasonable trial judge could construe Ginsberg's report that way. Thus, we cannot find an abuse of discretion in this case.

We conclude that *McMenemy* and *Estate of Allen* are distinguishable, because the use of "could" in the reports involved in those cases clearly signified no more than a mere possibility. In *McMenemy*, the patient suddenly lost virtually all vision in his left eye, obtained treatment from an ophthalmologist, and never recovered his vision. 2007 WL 4842452, at *1. The patient sued the ophthalmologist and furnished a report in which his expert outlined the treatment the ophthalmologist should have rendered and concluded, "if Dr. McMenemy had timely treated Mr. Holden in this manner, he *could* have regained the sight in his left eye." *Id.* at *3 (emphasis in original). We agree that this statement, in context, signified only that Holden had a possibility of recovering his sight had McMenemy rendered proper treatment to Holden. Nothing in the report suggested that the possibility rose to the level of a probability. The plaintiff's report in *Estate of Allen* contained state-

ments that the defendants' negligence "could have contributed" to the worsening of the decedent's condition and "could have contributed to the progressive decline of his health and eventual demise." 2005 WL 497291, at *5 (emphases omitted). Again, in context, these statements indicated nothing more than mere possibility. By contrast, Ginsberg's assertion that Pin could have avoided her severe injuries if she had not taken Prednisone is more plausibly read as an assertion of past ability—a past ability to avoid harm that was lost when she took the Prednisone. Ginsberg's use of the word "could" implies a degree of probability that was absent in *McMenemy* and *Estate of Allen.*

### 3. Conclusion

Ginsberg's report constitutes a good-faith effort to comply with section 74.351(r)(6) as to the essential element of causation. The trial court did not abuse its discretion by denying Quinones's motion to dismiss.

### IV. DISPOSITION

We affirm the trial court's order denying Quinones's motion to dismiss.