**Affirmed and Opinion Filed August 30, 2021**



In The
# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-20-00817-CV

**GATEWAY DIAGNOSTIC IMAGING, LLC D/B/A GATEWAY DIAGNOSTIC IMAGING MID-CITIES, Appellant**
**V.**
**KRISHNA VERNI RATNASABAPATHY, INDIVIDUALLY AND AS NEXT FRIEND OF T.R., A MINOR, AND V.R., A MINOR AND AS INDEPENDENT ADMINISTRATOR OF THE ESTATE OF PRADEEPAN RATNASABAPATHY, Appellee**

**On Appeal from the 101st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-20-00614**

## MEMORANDUM OPINION

Before Justices Osborne, Pedersen, III, and Nowell
Opinion by Justice Osborne

This is a health care liability claim under civil practice and remedies code Chapter 74. The trial court denied appellant's motion to dismiss. We conclude that (1) the trial court properly considered appellee's expert reports that were filed and amended within 120 days of appellant's answer and (2) the amended reports were sufficient to meet Chapter 74's requirements. Accordingly, we affirm the trial court's order.

## BACKGROUND

We summarize the facts as pleaded in the operative petition. Pradeepan Ratnasabapathy died after he had an anaphylactic reaction to the contrast given to him for a routine CT scan at appellant Gateway Diagnostic Imaging, LLC d/b/a Gateway Diagnostic Imaging Mid-Cities ("Gateway"). Appellee Krishna Verni Ratnasabapathy, individually and as next friend of minors T.R. and V.R. and as administrator of Pradeepan Ratnasabapathy's estate ("Krishna"[1]) filed suit against Gateway on January 13, 2020.

Krishna alleged that Pradeepan arrived at Gateway on the morning of May 28, 2019, for a CT scan of his abdomen and pelvis with contrast to evaluate suspected kidney stones. A Gateway technician intravenously administered Isovue 370, an iodine-containing CT contrast, and began the CT scan at 9:15 a.m. Pradeepan responded to the CT contrast with signs of an anaphylactic reaction including seizure activity, foaming at the mouth, and difficulty breathing. Krishna alleged that despite Pradeepan's symptoms, the technician continued with the scan, and defendant Giri Sura, M.D.[2] proceeded to interpret it. A 911 call dispatched to the North Richland Hills Fire Department Emergency Medical Services ("EMS") did not occur until 9:32 a.m. Gateway's medical records had no reference to any emergency situation or response.

---

[1] For clarity we refer to the Ratnasabapathys by their first names.

[2] Dr. Sura is not a party to this appeal.

Krishna alleged that according to EMS records, the EMS team arrived at Gateway at 9:38 a.m. EMS initially assessed Pradeepan as unresponsive with a weak pulse, agonal respirations, and foam coming out of his mouth. EMS moved Pradeepan to the ambulance where he was found to have life-threatening cardiac issues. EMS initiated emergency measures to address these issues and administered the emergency medications aminophylline and epinephrine. EMS noted Pradeepan had experienced cardiac arrest prior to their arrival at Gateway. The ambulance departed Gateway at 9:46 a.m. Pradeepan was pronounced dead at 10:17 a.m. The medical examiner's autopsy report concluded that Pradeepan died from anaphylaxis triggered by CT contrast media administration. Krishna alleged that "[c]ontrast anaphylaxis is a well-known complication of administering iodine-based contrast media and poses an extreme potential risk to patients when outpatient imaging centers, like Gateway, are unprepared to handle this emergency medical condition when it occurs."

Krishna alleged Gateway was negligent by failing to have a physician on site and immediately available to respond to a medical emergency. She also alleged Gateway was negligent by failing to have an emergency crash cart or an anti-anaphylaxis tray immediately available and stocked with supplies including epinephrine. She alleged that once Pradeepan exhibited signs of an anaphylactic reaction including seizure or seizure-like activity, foaming at the mouth, and apneic breathing, Gateway negligently (1) failed to stop the CT scan immediately, (2) failed

–3–

to notify a physician immediately, (3) failed to administer epinephrine, (4) failed to create an intravenous or intraosseous line or to elevate the patient's legs over 60 degrees, and (5) failed to call 911 immediately.

Gateway filed its original answer on February 14, 2020. On February 17, 2020, Krishna served the expert report of Richard M. Gore, M.D., F.A.C.R. On March 6, 2020, Gateway filed objections to Dr. Gore's report and requested that the trial court dismiss Krishna's suit. The record does not reflect that there was a hearing or ruling on these objections.

Krishna amended her petition twice, and on April 13, 2020, withdrew Dr. Gore's initial report and served an amended report dated March 26, 2020. On the same date, Krishna also served the expert report of Caroline Ferris, M.D. dated April 9, 2020. Gateway filed objections to these reports on May 1, 2020 and requested dismissal of the suit. Again, the record does not reflect that there was a hearing or ruling on these objections.

On June 10, 2020, Krishna withdrew Dr. Gore's March 26 report and Dr. Ferris's April 9 report. She served amended reports by Dr. Gore and Dr. Ferris dated June 10, 2020, and an initial report by TerriAnn Ryan, a radiographer registered by the American Registry of Radiologic Technologists/AART dated May 23, 2020. Gateway filed objections to each of these reports on June 30, 2020 and requested dismissal. The trial court heard Gateway's objections and motion to dismiss on

August 24, 2020. The trial court overruled Gateway's objections and denied the motion to dismiss by order of August 25, 2020. This appeal followed.

## ISSUE AND STANDARD OF REVIEW

In one issue with two subparts, Gateway contends the trial court erred by denying its motion to dismiss under Chapter 74 of the Texas Medical Liability Act. *See* TEX. CIV. PRAC. & REM. CODE §§ 74.351–.403 (addressing expert reports and experts' qualifications) ("Chapter 74"). Gateway argues (1) Chapter 74 does not allow Krishna to serve new reports without the trial court first determining that the original report is deficient and providing Krishna an opportunity to cure, and (2) in the alternative, if the amended reports are considered, they are deficient.

We review a trial court's ruling on an expert report's sufficiency for abuse of discretion. *Baty v. Futrell*, 543 S.W.3d 689, 693 (Tex. 2018). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

In analyzing an expert report's sufficiency under this standard, we consider only the information contained within the four corners of the report. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018). One expert need not address the standard of care, breach and causation. *Id.* Multiple expert reports may be read together to determine whether these requirements have been met. *Id.*

We review issues of statutory interpretation de novo. *Baylor Univ. Med. Ctr. v. Lawton*, 442 S.W.3d 483, 484 (Tex. App.—Dallas 2013, pet. denied).

DISCUSSION

## A. Chapter 74 procedure

Chapter 74 "requires that the plaintiff, to avoid dismissal, serve an expert report addressing liability and causation as to each defendant within 120 days after the defendant files an original answer." *Rogers v. Bagley*, 623 S.W.3d 343, 348 (Tex. 2021) (citing TEX. CIV. PRAC. & REM. CODE § 74.351(a)). In response, "[e]ach defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived." TEX. CIV. PRAC. & REM. CODE § 74.351(a). A defendant filing a challenge within the first 120 days, however, "*cannot* seek dismissal or fees until the 120-day window has closed." *Lewis v. Funderburk*, 253 S.W.3d 204, 207 (Tex. 2008).

Here, all of Krishna's expert reports were filed within the 120-day window. Gateway timely filed objections to each report within 21 days of its service. After the 120-day period had run, Gateway presented its motions to dismiss to the trial court for hearing.

Gateway argues the trial court erred by considering any report other than Dr. Gore's first report. Citing section 74.351(c)'s provision that a trial court "may grant one 30-day extension to the claimant" in order to cure a deficiency, Gateway contends "a plaintiff does not have carte blanche to issue and reissue reports during

the 120-day period." *See* TEX. CIV. PRAC. & REM. CODE § 74.351(c). Gateway argues that before Krishna could add experts or serve amended reports, she needed the trial court's permission to cure deficiencies in Dr. Gore's original report.

Gateway relies on several cases addressing section 74.351(c)'s provision that if an expert report has been "found deficient," a trial court "may grant one 30-day extension to the claimant in order to cure the deficiency." *See, e.g., Nw. EMS Consultants, P.A. v. Guillory*, No. 01-19-00668-CV, 2020 WL 4516872, at *14 (Tex. App.—Houston [1st Dist.] Aug. 6, 2020, pet. denied) (mem. op.) (where trial court did not find deficiencies in plaintiff's initial report, plaintiff was "never entitled to a thirty-day extension to cure any deficiencies"). In each of Gateway's cases, courts cited section 74.351(c)'s "one 30-day extension" provision in concluding that plaintiffs have only "one opportunity to cure deficiencies pointed out in their expert report before their claims are dismissed with prejudice." *Marino v. Wilkins*, 393 S.W.3d 318, 332 (Tex. App.—Houston [1st Dist.] 2012, pet. denied); *see also Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 512 (Tex. 2017) (per curiam) ("The trial court found the reports deficient but granted Miller an extension to cure the deficiencies."); *Lewis*, 253 S.W.3d at 208 ("the statute allows a claimant to cure a deficiency"); *Lovitt v. Colquitt*, No. 05-18-00939-CV, 2019 WL 3212144, at *1 (Tex. App.—Dallas July 9, 2019, pet. denied) (mem. op.) (trial court sustained defendant's objections and granted 30-day extension to cure).

Gateway construes these cases to mean that section 74.351(c) prohibits amendment of expert reports within section 74.351(a)'s 120-day period unless the trial court has first ruled that the reports are deficient. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a), (c). We disagree. In each case, as Gateway argues, the trial court had heard and ruled on the defendant's initial motion to dismiss before the plaintiff served an amended report.[3] But the courts were not presented with the question, and did not hold, that section 74.351(c) prohibits amendment of reports within the 120-day period before the trial court has ruled on a defendant's objections or motion to dismiss.

Krishna replies that that during the 120-day period, plaintiffs may amend their reports before the trial court has made any ruling on the reports' sufficiency. She cites *Christus Santa Rosa Health Care Corp. v. Vasquez*, 427 S.W.3d 451, 454 (Tex. App.—San Antonio 2014, no pet.), in support of her argument. In *Vasquez*, the court explained:

> Chapter 74 required Christus to raise any objections to the Vasquez Heirs' expert report within twenty-one days after they were served, or any complaints were waived. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). If a plaintiff chooses to serve its expert reports well before

---

[3] *See Miller*, 536 S.W.3d at 512 (trial court initially found reports deficient, granted extension to cure, and denied defendants' renewed motions to dismiss directed to amended reports); *Lewis*, 253 S.W.3d at 206 (trial court denied initial motion to dismiss, granted 30-day extension to cure, and denied subsequent motion to dismiss based on new report); *Lovitt*, 2019 WL 3212144, at *1 (trial court sustained defendant's objections to report, granted plaintiff thirty days to file amended report, and denied motion to dismiss directed to amended report); *Guillory*, 2020 WL 4516872, at *14 (trial court overruled defendant's objections to report, so plaintiff had never been entitled to extension to cure); *Marino*, 393 S.W.3d at 323–24 (after hearing, trial court granted 30-day extension to cure deficiencies it found in report).

the 120–day deadline, as the Vasquez Heirs did in this case, Christus was still required to file objections to the report within twenty-one days after they were served, even though a motion to dismiss could not yet be filed. *Id.* **By filing their expert report early, Christus's objections provided an opportunity for the Vasquez Heirs to correct any deficiencies in the report and re-serve the report before the 120–day deadline.** *Id.* Thus, the Vasquez Heirs' motion seeking rulings on the Christus objections was proper.

*Vasquez*, 427 S.W.3d at 454 (emphasis added).

Krishna also cites *Constancio v. Bray*, 266 S.W.3d 149, 161 (Tex. App.—Austin 2008, no pet.). In that case the court explained that "[a] plaintiff has, by statute, 120 days from the filing of the petition in which to get a complying report served even if the plaintiff has already served one or more non-complying reports." *Id.* Although the question presented in *Constancio*—the permissible length of an extension of time to file an amended report—is different, the court noted, "[i]f an expert report is served early in the statutory period and objections are filed and heard right away, a revised complying report could well be served within the 120-day statutory period without any need for an extension." *Id.*

Gateway responds that if Krishna's argument is correct, *Constancio* would mean that any ruling within the 120-day period that a report is deficient would be "a premature nullity," and a plaintiff "need do nothing or may serve as many amended reports as he or she pleases." We disagree. Section 74.351(a) required Gateway to object within 21 days to the sufficiency of Krishna's reports, and Gateway did so. Gateway did not, however, set its objections for hearing and obtain a ruling. Under

–9–

section 74.351(c), the trial court could have heard and sustained Gateway's objections within the 120-day period, triggering Krishna's burden to "cure the deficiency" and limiting multiple amendments to the reports. *See Marino*, 393 S.W.3d at 332 (concluding that plaintiffs "are given one opportunity to cure deficiencies pointed out in their expert report before their claims are dismissed with prejudice"). The statute does preclude dismissal of the case before the 120-day period has run, but not rulings on objections. *Lewis*, 253 S.W.3d at 207 ("[S]ome challenges [to inadequate reports]—specifically those filed within the first 120 days—*cannot* seek dismissal or fees until the 120-day window has closed.").

Section 74.351(c) presumes that a court has already "found" an expert report to be "deficient," providing that "[i]f an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient," then a trial court may grant one 30-day extension to cure the deficiency. At the time Krishna filed her amended reports, however, the trial court had not made any ruling of a "deficiency" and no "cure" was required. Consequently, we conclude that section 74.351(c) did not prohibit Krishna from amending her experts' reports within the 120-day period. As in *Vasquez*, "[b]y filing [her] expert report early, [Gateway's] objections provided an opportunity for [Krishna] to correct any

deficiencies in the report and re-serve the report before the 120-day deadline." *See Vasquez*, 427 S.W.3d at 454. We decide this portion of Gateway's issue against it.[4]

## B. Sufficiency of reports

An expert report under section 74.351 must represent a good-faith effort to provide a fair summary of the expert's opinions. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878–79 (Tex. 2001). The report need not marshal all the plaintiff's proof, but must include the expert's opinion on each of the elements identified in the statute. *Id.* To constitute a good-faith effort, the report must (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude the claims have merit. *Id.* at 879.

In addition, "the expert report must make a good-faith effort to explain, factually, how proximate cause is going to be proven," although the report need not use the words "proximate cause," "foreseeability," or "cause in fact." *Columbia*

---

[4] Our conclusion is supported, although implicitly, by *HealthSouth Corp. v. Searcy*, 228 S.W.3d 907 (Tex. App.—Dallas 2007, no pet.). In *Searcy*, plaintiff Searcy filed an initial report and two amended reports of his expert Dr. Koslow within the 120-day period. *See id.* at 908–09. Defendant HealthSouth filed objections and a motion to dismiss to the first two reports, but not the third. *Id.* at 908, 909. The trial court heard and denied HealthSouth's objection to the June 8, 2006 first amended report, and HealthSouth complained of that ruling on appeal. *Id.* We concluded: (1) the second amended report filed on September 12, 2006, was the operative report before the trial court and this Court "[b]ecause an amended filing supplants the previously filed document," and (2) "there is nothing for this Court to review with respect to Dr. Koslow's expert report" because HealthSouth did not object to the September 12, 2006 report. *Id.* at 909. The opinion does not state expressly that a plaintiff may amend expert reports within the 120-day deadline, but that conclusion is implicit in our holding that the September 12, 2006 amended report was the operative document.

*Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). "'[T]he expert must explain the basis of his statements to link his conclusions to the facts.'" *Id.* (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). "[C]ourts must view the report in its entirety, rather than isolating specific portions or sections, to determine whether it includes" the required information. *Baty*, 543 S.W.3d at 694.

To establish a causal relationship between the injury and the defendant's negligent act or omission, the expert report must show the defendant's conduct was a substantial factor in bringing about the harm, and, absent this act or omission, the harm would not have occurred. *Mitchell v. Satyu*, No. 05-14-00479-CV, 2015 WL 3765771, at *4 (Tex. App.—Dallas June 17, 2015, no pet.) (mem. op.). Causation is generally established through evidence of a "reasonable medical probability" that the injury was caused by the negligence of the defendant, meaning that it is more likely than not that the ultimate harm or condition resulted from such negligence. *See id.* "An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff." *Id.* The report must explain "to a reasonable degree, how and why the breach [of the standard of care] caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 539–40; *Quinones v. Pin*, 298 S.W.3d 806, 814 (Tex. App.—Dallas 2009, no pet.) (to satisfy Chapter 74's causation requirement, expert report must include fair summary of expert's opinion regarding causal relationship between breach of standard of care and injury, harm, or damages claimed). "We determine whether a causation opinion

is sufficient by considering it in the context of the entire report." *Mitchell*, 2015 WL 3765771, at *4 (internal quotation omitted).

Gateway first challenges Dr. Gore's and Dr. Ferris's initial reports served in February and April 2020, as it timely did in the trial court. Krishna, however, withdrew these reports, serving each amended report with a cover letter stating that the prior reports are "hereby withdrawn." As we have explained, Krishna could correct deficiencies in her earlier reports by amending the reports within section 74.351(a)'s 120-day period. *See Vasquez*, 427 S.W.3d at 454. Consequently, we need consider only Gateway's challenges to the operative June 10, 2020 reports. *See Searcy*, 228 S.W.3d at 909 ("Because an amended filing supplants the previously filed document, Dr. Koslow's second amended expert report is the document before the trial court and this Court.").

Gateway argues the experts' reports fail to satisfy section 74.351's requirements, as we discuss below. Krishna generally responds that the expert reports sufficiently inform Gateway "what it is accused of doing wrong and why": "Gateway technicians did not properly respond to Pradeepan's allergic reaction, and because Gateway did not have a physician on premises, Pradeepan died of what should have been an easily treatable condition."

Gateway challenges the experts' standard of care opinions and their opinions as to causation. We discuss each challenge in turn.

**1. Standard of care opinions**

Dr. Gore opined that Gateway violated several standards of care:

> The <u>standard of care</u> requires a radiologist or other physician responsible for coverage of medical emergencies at a freestanding imaging center to be physically on-site at the imaging center and immediately available to respond to an emergency. The most common medical emergency that occurs at a freestanding imaging center is anaphylaxis to CT contrast media.
> . . .
> [T]he <u>standard of care</u> requires the radiologist or physician to immediately administer epinephrine to the patient and document the response and emergency medical care provided in imaging center medical record[s].
> . . .
> Based on the lack of documentation of an emergency response by Dr. Sura, it is likely that Dr. Sura was not physically present at Gateway and immediately available to respond to [Pradeepan's] medical emergency, in <u>violation of the standard of care</u>.
> . . .
> The <u>standard of care</u> requires a freestanding imaging center to have an emergency crash cart or anti-anaphylaxis tray ("crash cart") that is immediately available and stocked with supplies, including epinephrine. When the crash cart is retrieved and moved to the site of a patient's medical emergency, the <u>standard of care</u> requires the imaging center's CT technologist or other personnel to document the same in the patient's medical record.
>
> In the event that medications or supplies from the crash cart are used in patient care, the <u>standard of care</u> requires the imaging center's CT technologist or other personnel to document the same in the patient's medical record. In the event of a medical emergency, the <u>standard of care</u> requires the imaging center's CT technologist or other personnel to document the medical emergency, including any call to 911, the identity of health care providers who were notified and responded to the emergency, and the actual care provided. . . . Gateway's CT technologist or other personnel <u>violated the standard of care</u> by failing to make any documentation in [Pradeepan's] medical records concerning the call to 911, the medical emergency, and response.

–14–

The Gateway documentation does not record that any emergency care was provided to [Pradeepan] prior to EMS arrival, including moving any crash cart to his location. This indicates that a properly stocked crash cart was likely unavailable, which is a <u>violation of the standard of care</u> by Gateway. Even if an appropriate crash cart had been available, though, the lack of documentation in the medical records makes it likely that a crash cart was not moved to [Pradeepan's] location or used in his care, a <u>violation of the standard of care</u>.

Ryan, in turn, opined that Gateway violated the standards of care requiring that the health care professional performing the contrast injection must be under the direct supervision of a radiologist "or his or her physician designee," meaning that the physician "must be present and immediately available to furnish assistance and direction through the performance of the procedure," although not necessarily in the same room. If the radiologist or physician is not "present and immediately available," the imaging center must delay or cancel the procedure. Next, Ryan opined that Gateway had violated the standard of care by completing the scan and by failing to notify a physician despite Pradeepan's adverse reaction. Ryan cited the delay between the time of the scan (9:15 a.m.) and the time the 911 call was made (9:32 a.m.) in reaching her conclusion. Ryan also explained that the standard of care requires a technician to "recognize any and all adverse reactions to contrast media," and, having done so, must "stop the CT scan and immediately call for help," including "notifying the supervising radiologist or physician immediately and calling 911." Ryan opined that Gateway violated these standards, citing EMS records showing that "a Gateway staff member stated that [Pradeepan] had a seizure

once contrast was given," and the 17-minute delay between completion of the scan and the call to 911.

Additionally, Ryan opined that the standard of care required the CT technologist to assist the radiologist, physician, or EMS crew by preparing emergency supplies. She explained that the EMS crew should have found at the patient's location a crash cart, appropriate drugs, oxygen administration equipment, and equipment necessary for intravenous administration of medication. Ryan concluded the Gateway technologist violated this standard of care because Gateway's and EMS's records "do not reflect or acknowledge the presence of a crash cart or any emergency equipment available for their use, which indicates that the CT technologist did not likely assemble them at the patient's location, if they existed at the Gateway facility at all."

Ryan next opined that the standard of care required the technician to measure and document Pradeepan's blood pressure and pulse count, and the technician violated the standard of care by failing to do so. Further, the standard of care required the technician to recognize the signs of anaphylactic reaction and, upon doing so, to "place the patient in a supine recumbent position with feet elevated 60 degrees"— not on his side—in order to facilitate performance of CPR. Ryan stated that EMS records showed the technologist violated this standard by improperly placing Pradeepan on his side with a pillow under his head. Last, Ryan described the standards of care for documentation, including "an appropriate contrast media

allergic history form with complete documentation for each patient receiving contrast" and protocols for administration of contrast media. Ryan stated that Gateway violated this standard of care because "[t]here was no documentation in the radiology report or the patient's medical records facility."

Gateway challenges two specific standard of care opinions by the experts: (1) the Gateway technician violated the standard of care by completing the CT scan despite Pradeepan's adverse reaction to administration of the contrast media, and (2) Gateway violated the standard of care that required a radiologist or physician to be present and immediately available to supervise directly and to furnish assistance. Gateway argues these opinions are "speculative and not supported by the facts" established in the medical records.

Regarding completion of the scan, Gateway argues that Ryan's opinions improperly "assume[ ] [that Pradeepan] exhibited seizure signs before the CT scan [was] completed," and constitute "speculations not supported by the four corners of the reports." Gateway also argues Ryan improperly assumed that the technician placed Pradeepan on his side.

Ryan, however, explained that her opinion about completion of the scan was based on EMS records showing that "a Gateway staff member stated" that Pradeepan "had a seizure once contrast was given." Ryan further stated, "[t]he medical records reflect that the 911 call related to [Pradeepan] was made after the CT scan was complete (the scan was at 9:15 a.m. and the 911 call was at 9:32 a.m.)." Ryan also

–17–

explained that her opinion about placing Pradeepan on his side was based on "EMS documentation" reflecting information "that a Gateway staff member shared" with EMS. Similarly, Dr. Gore stated that "EMS documented finding the patient lying on his side in the hallway, with pillows under his head, with foam coming out of his mouth, weak pulse, and agonal respirations pushing foam out of his mouth." In sum, Dr. Gore and Ryan state that their opinions are based on EMS records. Gateway's disputes about the data in those records are "beyond the scope of a section 74.351(b) challenge." *Quinones*, 298 S.W.3d at 813 (in addressing sufficiency of expert's report in connection with Chapter 74 motion to dismiss, reviewing court is "limited to the four corners of the report in assessing its sufficiency"; attack on data underlying opinion is beyond the scope of a § 74.351(b) challenge).

Regarding the presence of a physician, Gateway argues that the EMS records showed an "MD" was present at the facility,[5] and Krishna's experts were required to consider and comment on this fact. Gateway cites *Loaisiga v. Cerda*, 379 S.W.3d 248, 261 (Tex. 2012), where the court stated, "we fail to see how in most instances, and particularly in claims involving the scope of an examination, an expert report

---

[5] Gateway argues we must accept this fact as true because Krishna did not challenge it in her appellate brief. *See* Tex. R. App. P. 38.1(g) (appellate court will "accept as true the facts stated" in appellant's brief "unless another party contradicts them"). We disagree that this fact is unchallenged. Among other contentions, Krishna argued in her brief that "[a]n EMS notation of 'MD,' proves nothing, not only because there is no indication of what 'MD' stands for, but also because there is no way to determine who made the notation or whether it is correct." She concluded that "[g]iven the lack of any medical records from Gateway and the other evidence indicating that no physician was present, i.e., the lack of any emergency response or administration of epinephrine by Gateway, the Ratnasabapathys' experts were simply not required to believe the hearsay records, and neither was the trial court in determining the existence of a good faith effort."

could be adequate unless the expert at least considered and commented on the patient's medical records to the extent the records and their contents—or lack of appropriate contents—are relevant to the expert's opinion." Gateway further asserts no expert opined that Gateway's records were required to indicate a physician was available, and in any event, Gateway's records do reference Dr. Sura. Consequently, Gateway argues, Dr. Gore and Ryan only speculate that Dr. Sura was not present during Pradeepan's seizure. Dr. Gore and Ryan, however, explain the basis for their conclusion that a physician was not present or available. Ryan's opinion is "[b]ased on the lack of any reference to a radiologist or physician response to [Pradeepan's] medical emergency in the Gateway medical records." Dr. Gore, in turn, explained, "[b]ased on the lack of documentation of an emergency response by Dr. Sura, it is likely that Dr. Sura was not physically present at Gateway and immediately available to respond" to Pradeepan's emergency.

Gateway argues that Dr. Gore's and Ryan's opinions on these matters are complaints about failures to document, not complaints about failures in treatment. Gateway contends these opinions are "superfluous" because they improperly speculate on what the absence of notations in Gateway's records mean, and neither Dr. Ferris's reports nor anything else in the record indicates how the failure to document caused Pradeepan's death. Gateway asserts that the experts made improper inferences from the absence of notations in the medical records, filling "factual gaps" with "guesses." Gateway argues:

> Without a factual basis for their assertion that no physician was available, there is no support for the experts' opinion that Gateway violated the standard of care by conducting the CT scan without a physician available, and without support for this opinion, there is nothing to support that Gateway was responsible for a physician not being present to administer epinephrine to [Pradeepan] (which, as explained above, is the only alleged breach Dr. Ferris attempted to tie causally to [Pradeepan's] death).

Gateway concludes that Dr. Gore's and Ryan's standard of care opinions regarding lack of documentation are speculative, unreliable, and not tied to any causation opinion.

In support of its arguments, Gateway urges us to "limit the scope" of *Quinones v. Pin*, 298 S.W.3d at 812–13, and *Bell v. Markham*, No. 05-19-00041-CV, 2020 WL 486668, at *6 (Tex. App.—Dallas Jan. 30, 2020, no pet.) (mem. op.), because "allowing experts to broadly assume the existence of facts from their absence in medical records opens the door to frivolous medical malpractice actions surviving Chapter 74 challenges, defeating the statute's purpose." We disagree that the analysis in these cases fosters frivolous claims. In both cases, the experts described how the care given failed to meet the required standards of care, as the experts did here. *See Quinones*, 298 S.W.3d at 813; *Bell*, 2020 WL 486668, at *6.

In *Quinones*, we explained, "[w]ith respect to the element of breach of the standard of care, the expert must set forth what care was expected but not given." *Quinones*, 298 S.W.3d at 813. The expert "must explain the basis of his statements to link his conclusions to the facts." *Id.* (internal quotation omitted). The expert in *Quinones* "relie[d] on the silence of the medical records" to infer that the doctor

–20–

failed to advise the plaintiff about the risks and side effects of Prednisone. *Id.* The expert then concluded that the doctor "failed to provide the appropriate standard of care when he prescribed this particular Prednisone therapy without disclosing the risks or hazards inherent therein, 'most particularly with regard to masking infections or the appearance of new infections.'" *Id.* We concluded the expert's report "explain[ed] the care that was required and not given in a nonconclusory way." *Id.*

In *Bell*, the expert opined that the standard of care required the defendants to treat the plaintiff's periodontal infection. *See Bell*, 2020 WL at *6. Henwood, the expert, noted that the defendants' medical records were "devoid of any evidence of follow-up on [the plaintiff's] condition and/or treatment." *Id.* We explained, "[h]ere, Henwood's report stated the standard of care required [defendants] to treat [plaintiff's] periodontal infection, but the lack of documented treatment plan or referral is evidence they did not comply with the standard of care." *Id.* We concluded that "Henwood's report provided adequate detail on how the care rendered by [defendants] failed to meet the required standards of care as described above." *Id.*

In both *Bell* and *Quinones*, the experts explained "the basis of [their] statements to link [their] conclusions to the facts." *Quinones*, 298 S.W.3d at 813. Similarly here, Ryan and Dr. Gore fully explained how and why the standard of care required Gateway to have a physician or radiologist present or immediately available to respond to emergencies when a technician is administering a CT scan. *See*

–21–

*Quinones*, 298 S.W.3d at 813; *Bell*, 2020 WL at *6. They explained how their conclusion that a physician was not present was based not only on the "lack of appropriate contents" in Gateway's records, *see Loaisiga*, 379 S.W.3d at 261, but also on the "lack of emergency response" by Gateway in the time between completion of the test and the call to 911.

Consequently, we conclude that there is no "factual gap" for the trial court to have filled. The experts have explained how "the records and their contents—or lack of appropriate contents—are relevant to [their] opinion." *See Loaisiga*, 379 S.W.3d at 261. We conclude the expert reports explained in adequate detail the care that was required and how Gateway failed to meet applicable standards of care. *See Quinones*, 298 S.W.3d at 813; *Bell*, 2020 WL at *6. We decide this portion of Gateway's issue against it.

**2. Challenges to causation opinions**

Dr. Gore opined: "It was foreseeable to Gateway that the failure to have a radiologist or physician physically present and immediately available, and the failure to have an adequate crash cart available at the facility and moved to the patient's location would cause delayed emergency care and the death of a patient experiencing CT contrast anaphylaxis." Dr. Ferris opined: "The effects of the standard intervention of epinephrine administration in this clinical circumstance would likely have stabilized [Pradeepan's] cardiovascular and respiratory status until EMS arrived to provide any additional support necessary before transporting the patient

to the hospital. On this basis, he would have likely survived this incident." Relying on Ryan's and Dr. Gore's standard of care opinions, Dr. Ferris discussed in detail the information in the medical records supporting her conclusions. She explained how anaphylaxis occurs and progresses and how administering epinephrine "prevents . . . [and] actually reverses the symptoms of anaphylaxis itself."

Gateway challenges Dr. Ferris's causation opinions on several grounds, arguing that:

- Dr. Ferris's causation opinion is speculative and an analytical gap exists because Dr. Ferris did not explain her reference to the "additional support necessary" that could have been provided by EMS to save Pradeepan's life. Further, Dr. Ferris fails to "describe what treatment EMS or the hospital would have needed to provide to [Pradeepan] in order to prevent his death even if the radiology technician had not allegedly breached the standard of care."

- Dr. Ferris's causation opinion is based on Dr. Gore's and Ryan's speculative opinions about Gateway's duties.

- The only breach Dr. Ferris tied to a causation opinion is the failure to administer epinephrine. As a result, all of the other alleged breaches are "superfluous."

- Dr. Ferris does not explain why Pradeepan would have lived had he been given epinephrine sooner.

Gateway concludes that "[a]t best, Dr. Ferris's opinion requires an inference that, had [Pradeepan] received epinephrine earlier, he would not have died—but that does not satisfy section 74.351."

In support of its contention that Dr. Ferris was required to explain what additional support EMS or the hospital could have given Pradeepan, Gateway relies

–23–

on *Lovitt v. Colquitt*, 2019 WL 3212144, at *6. In *Lovitt*, Colquitt fell at his home the day after undergoing surgery performed by Lovitt. *Id.* at *1. Colquitt's expert opined, among other conclusions, that Colquitt should have been kept in the hospital overnight after his surgery. *Id.* at *6. The expert, however, did "not explain how and why another night in the hospital would have prevented his fall or reduced his risk of falling." *Id.* Nor did the expert "describe any treatment [Colquitt] should have received during this additional night or how that treatment would have been effective at reducing his risk of falling due to his impaired mobility and weakness due to pain medications." *Id.* The report did not connect the probable cause of Colquitt's fall— "hypovolemic shock due to hemorrhage"—to the failure to keep Colquitt in the hospital for an additional night, because the report did not say "that the condition existed before the fall or that Lovitt's acts or omissions caused the condition." *Id.* In sum, the report did not "explain how and why the alleged breach proximately caused the injury." *Id.*

Here, in contrast, Dr. Ferris explained in detail how and why Pradeepan "would have likely survived" with immediate administration of epinephrine. She described the "mechanism[s] by which epinephrine acts" to stabilize mast cells, to increase blood pressure and heart rate, and to mitigate the problems of anaphylaxis including hypotension and vascular collapse, "actually revers[ing] the symptoms of anaphylaxis itself." Unlike the report in *Lovitt*, Dr. Ferris's report "link[s] the expert's conclusions to the relevant facts . . . to explain how and why the alleged

–24–

breach proximately caused the injury." *See Lovitt*, 2019 WL 3212144, at *6. Further, Dr. Ferris was not required to address "every possible cause" of Pradeepan's death. *See Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.) ("Nothing in section 74.351 suggests the preliminary report is required to rule out every possible cause of the injury, harm, or damages claimed.").

We have already concluded that Ryan's and Dr. Gore's opinions on standards of care meet Chapter 74's requirements and are not "speculative" as Gateway contends. Dr. Ferris, in turn, explained how anaphylaxis occurs and progresses. She concluded, from her review of Pradeepan's autopsy and from her knowledge, training, and experience, that anaphylaxis was the cause of Pradeepan's death. She opined that compliance with the standards of care—culminating in "immediate administration of epinephrine"—would have prevented or reversed the anaphylaxis that caused Pradeepan's death. According to Dr. Ferris, other breaches of the standards of care identified by Ryan and Dr. Gore, including failure to prepare emergency supplies and the lack of response from a radiologist or physician, contributed to the failure to immediately administer epinephrine. Consequently, these breaches are not "superfluous."

We also conclude Dr. Ferris explained why Pradeepan would have lived had he been given epinephrine sooner. She explained why she agreed with the autopsy report's conclusion that Pradeepan died from "anaphylaxis due to contrast media administration." She then explained the "physiological mechanism of anaphylaxis"

–25–

and "[t]he effects of the standard intervention of epinephrine administration in this clinical circumstance" before stating her opinion that immediate administration of epinephrine by Gateway would have prevented Pradeepan's death. We conclude that the trial court did not abuse its discretion in overruling Gateway's challenges to the experts' reports' sufficiency on the issue of causation. *See Mitchell*, 2015 WL 3765771, at *9.

Because the experts' reports explain, to a reasonable degree, how and why Gateway's breaches of the standard of care caused the injury based on the facts presented and represent an objective good faith effort to inform Gateway of the causal relationship between its alleged failure to adhere to the applicable standards of care and Pradeepan's death, we decide Gateway's issue against it. *See id.* at *4, 9.

## CONCLUSION

The trial court's August 25, 2020 order overruling Gateway's objections to the expert reports and denying Gateway's motion to dismiss is affirmed.

200817f.p05

/Leslie Osborne//
LESLIE OSBORNE
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

GATEWAY DIAGNOSTIC IMAGING, LLC D/B/A GATEWAY DIAGNOSTIC IMAGING MID-CITIES., Appellant

No. 05-20-00817-CV      V.

KRISHNA VERNI RATNASABAPATHY, INDIVIDUALLY AND AS NEXT FRIEND OF T.R., A MINOR, AND V.R., A MINOR, AND AS INDEPENDENT ADMINISTRATOR OF THE ESTATE OF PRADEEPAN RATNASABAPATHY, Appellee

On Appeal from the 101st Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-20-00614. Opinion delivered by Justice Osborne. Justices Pedersen, III and Nowell participating.

In accordance with this Court's opinion of this date, the trial court's order of August 25, 2020, is **AFFIRMED**.

It is **ORDERED** that appellee Krishna Verni Ratnasabapathy, individually and as next friend of T.R., a minor, and V.R., a minor, and as Independent Administrator of the Estate of Pradeepan Ratnasabapathy, recover her costs of this appeal from appellant Gateway Diagnostic Imaging, LLC d/b/a Gateway Diagnostic Imaging Mid-Cities.

Judgment entered this 30th day of August, 2021.