**AFFIRMED and Opinion Filed January 24, 2022**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-21-00039-CV**

**METHODIST HOSPITALS OF DALLAS D/B/A METHODIST MANSFIELD MEDICAL CENTER, Appellant**

**V.**

**CYNTHIA YATES, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF HUBERT YATES, Appellee**

**On Appeal from the County Court at Law No. 2**
**Dallas County, Texas**
**Trial Court Cause No. CC-19-07083-B**

## MEMORANDUM OPINION

Before Justices Molberg, Nowell, and Goldstein
Opinion by Justice Goldstein

Methodist Hospitals of Dallas d/b/a Methodist Mansfield Medical Center

(MMMC) appeals the trial court's order denying its motion to dismiss the health care

liability claim of Cynthia Yates, individually and as representative of the estate of

Hubert Yates. In a single issue, MMMC argues the trial court abused its discretion

in overruling its objections and denying its motion to dismiss because Yates failed

to serve a report from a qualified expert that adequately addressed the standard of

care, breach of that standard, and causation as to MMMC. We affirm.

**Background**

Yates filed the underlying health care liability claim against MMMC after the death of her husband, Hubert Yates. On August 31, 2017, Hubert was suffering from abdominal pain when he arrived at the MMMC emergency room. Hubert was diagnosed with pancreatitis and admitted to MMMC. Hubert had suffered pancreatitis before but reported that this pain felt different. He was diagnosed with acute pancreatitis without inflammation or necrosis. While he was hospitalized, he received CT scans and x-rays; however, he did not receive a CT scan with IV contrast or an MRI with contrast which would have confirmed whether the pancreatitis was necrotizing. Further, the CT scans and chest x-rays included the lower part of the lungs and showed lung abnormalities associated with necrotizing pancreatitis, a more serious form of pancreatitis. Hubert stayed in the hospital until September 26, 2017 and received treatment from several different doctors. Although Hubert was seen by a pulmonologist, no formal evaluation of the lungs with a chest CT scan was performed. On September 26, 2017, Hubert was discharged to Kindred Hospital for long-term care. The same day he was discharged, Hubert suffered an acute heart attack and passed away at Kindred Hospital.

In December 2019, Yates sued MMMC alleging, among other things, that MMMC was negligent in failing to properly monitor Hubert while he was a patient, including a failure to monitor his lungs prior to discharge; failing to act as a patient's advocate; failing to discuss with medical providers the rationale for discharge for an unstable patient such as Hubert; failing to have a comprehensive coordination of

–2–

medical care between physicians and medical staff; and failing to institute, oversee, and implement policies and procedures to guard against the types of injuries and damages sustained by Hubert . The factual basis of Yates' claim was that, if MMMC had proper policies, procedures, and training in place when Hubert entered the hospital to be treated for recurring acute pancreatitis, those proper policies would have dictated proper diagnostic testing that would have revealed necrotizing pancreatitis and would have led to appropriate treatment such as closer monitoring of lung function and ICU care if needed. Ultimately, Yates claims, such procedures would have prevented Hubert's transfer to Kindred Hospital and death.

In support of her claims, Yates served MMMC with the expert report of Boris Karaman, M.D. *See* TEX. CIV. PRAC. & REM. CODE § 74.351 (requiring plaintiff in health care liability case to serve expert report on defendants). MMMC objected to Karaman's expert report on the grounds that it failed to establish that Karaman was "qualified to offer opinions against" MMMC and Karaman failed to provide a fair summary of the standard of care applicable to MMMC or explain how MMMC breached that standard of care with regard to Hubert. Following a hearing on MMMC's objections and motion to dismiss, the trial court granted Yates' request for thirty days to amend the report. After Yates served an amended report, MMMC filed a motion to dismiss and objections to the amended report. The trial court overruled the objections and denied the motion to dismiss following a hearing.

MMMC then filed this interlocutory appeal. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9).

## Standard of Review

We review a trial court's order on a motion to dismiss a health care liability claim based on the sufficiency of an expert's report for an abuse of discretion. *Abshire v. Christus Health S.E. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

## Applicable Law

Chapter 74 of the Texas Civil Practice and Remedies Code requires claimants in health care liability cases to serve an expert report on each defendant. TEX. CIV. PRAC. & REM. CODE § 74.351. The report must fairly summarize "the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). The purpose of this requirement "is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire*, 563 S.W.3d at 223.

"Importantly, the trial court need only find that the report constitutes a 'good faith effort' to comply with the statutory requirements." *Id.* (citing TEX. CIV. PRAC.

–4–

& REM. CODE § 74.351(*l*)).  The Texas Supreme court has "held that an expert report demonstrates a 'good faith effort' when it '(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit.'"  *Id.* (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018).  A report "need not marshal all the claimant's proof," but "a report that merely states the expert's conclusions about the standard of care, breach, and causation" is insufficient.  *Id.*  The "court's job at this stage of the litigation is not to weigh the report's credibility; that is, the court's disagreement with the expert's opinion does not render the expert report conclusory."  *Id.* at 226.

In addition, "the expert report must make a good-faith effort to explain, factually, how proximate cause is going to be proven," although the report need not use the words "proximate cause," "foreseeability," or "cause in fact."  *Columbia Valley Healthcare Sys., L.P. v. Zamarippa*, 526 S.W.3d 453, 460 (Tex. 2017).  "[T]he expert must explain the basis of his statements to link his conclusions to the facts."  *Id.* (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)).  "[C]ourts must view the report in its entirety, rather than isolating specific portions or sections, to determine whether it includes" the required information.  *Baty*, 543 S.W.3d at 694.

To establish a causal relationship between the injury and the defendant's negligent act or omission, the expert report must show the defendant's conduct was a substantial factor in bringing about the harm, and, absent this act or omission, the

harm would not have occurred. *Mitchell v. Satyu*, No. 05-14-00479, 2015 WL 3765771, at *4 (Tex. App.—Dallas June 17, 2015, no pet.) (mem. op.). Causation is generally established through evidence of a "reasonable medical probability" that the injury was caused by the negligence of the defendant, meaning that it is more likely than not that the ultimate harm or condition resulted from such negligence. *See id.* "An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff." *Id.* The report must explain "to a reasonable degree, how and why the breach [of the standard of care] caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 539–40; *Quinones v. Pin*, 298 S.W.3d 806, 814 (Tex. App.—Dallas 2009, no pet.) (to satisfy Chapter 74's causation requirement, expert report must include fair summary of expert's opinion regarding causal relationship between breach of standard of care and injury, harm, or damages claimed). "We determine whether a causation opinion is sufficient by considering it in the context of the entire report." *Mitchell*, 2015 WL 3765771, at *4 (internal quotation omitted).

**Analysis**

**A. Qualifications**

MMMC argues that Karaman is not qualified as a hospital administration expert. Specifically, MMMC argues Karaman fails to show how he is qualified to opine as to what policies and procedures an acute care hospital should implement for diagnosis and discharge. MMMC contends that Karaman's "qualifications as a

radiologist and leader of the Radiology Department at his hospital do not demonstrate whether his experiences have involved setting policies and procedures for the entire hospital, setting policies and procedures for diagnosis, discharge, or transfer at a hospital, or running a hospital." In addressing Karaman's "administration qualifications," MMMC argues Karaman's Report and CV fail to show how he is qualified to render an opinion on what an ordinarily prudent hospital would do in drafting or implementing policies for the diagnosis and transfer of patients or on hospital administration, policies, or procedures.

MMMC correctly argues that, because MMMC is a health care provider, not a physician, section 74.402 of the civil practice and remedies code controls on the issue of whether Karaman is qualified to offer opinion testimony that MMMC departed from acceptable standards of care. Chapter 74 states an expert is qualified to give such opinions if he:

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
>
> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b). An expert's qualifications must appear within the report itself or the expert's CV. *Hollingsworth v. Springs*, 353 S.W.3d 506, 515 (Tex. App.—Dallas 2011, no pet.).

In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

> (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

> (2) is actively practicing health care in rendering health care services relevant to the claim.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(c).

The substance of Yates' claim against MMMC is that, if MMMC had proper policies, procedures, and training in place, those policies would have dictated proper diagnostic testing that would have revealed Hubert's necrotizing pancreatitis, would have led to appropriate treatment such as closer monitoring of lung function and ICU care if needed, and would have prevented Hubert's transfer to Kindred Hospital and death.

According to his report and curriculum vitae, Karaman has been board certified in internal medicine since 1986 and in radiology since 1990. He is licensed to practice in Ohio and Wyoming and is currently service chief in the department of radiology at the VA Northeast Ohio Healthcare System. He is a graduate of

–8–

Pennsylvania State University and Thomas Jefferson Medical College of Thomas Jefferson University. He served his residency in internal medicine from 1983 to 1986 and in diagnostic radiology from 1986 to 1990 at Cleveland Clinic Foundation. He completed a fellowship in neuroradiology and neurointerventional training at University Hospitals in Cleveland.

During his radiology residency, Karaman used his internal medicine training and practiced as an intensivist covering medical and cardiac ICUs. He served as a hospital physician, now commonly called a hospitalist. His report indicates he has experience with pancreatitis:

> I managed cases of acute non-necrotizing pancreatitis, acute necrotizing pancreatitis and acute or chronic pancreatitis. As severe pancreatitis was common, I had extensive experience with these variations of pancreatitis. I managed pancreatitis in patients who had received pancreas transplants, something only a minority of internal medical doctors can say.

After his fellowship, Karaman practiced at a level I trauma center from 1991 to 2003, using both his radiology and internal medicine skills. He provided rapid response to patients with medical emergencies in radiology and started an endovascular stroke treatment center, "shaping the internal medicine part of the stroke treatment protocols as well as providing the interventional neuroradiology that made it a success." He also provided body interventional radiology, "treating scores of patients with complications of necrotizing pancreatitis and providing them with Internal Medicine support while undergoing these treatments." Karaman's report

states that he has exercised his internal medicine skills throughout his medical career and continues to do so.

Karaman cites specific instances in which he used internal medicine skills to diagnose rare conditions that "do not show up on imaging in their early phases":

> I also used my internal medicine skills to narrow down the diagnosis when non-specific imaging findings left a host of differential diagnostic possibilities. I consulted with the referring services to help them to the answer. In this way I diagnosed three cases of parathyroid carcinoma, two cases of MTHFR mutation, and hundreds of other less rare conditions. I used a stethoscope daily in my practice.

Karaman's report describes teaching experience regarding pancreatitis: "I taught residents and medical students how to tell the difference between acute non-necrotizing pancreatitis and necrotizing pancreatitis and why that was so critical."

During the COVID pandemic, Karaman "stood ready at my medical center to take my turn as a hospitalist and intensivist managing COVID-19 positive patients as we prepared for an onslaught of critically ill infected patients." Karaman's description of his qualifications includes the following relevant to hospital administration:

> As radiology service chief, I oversee the process of crafting imaging policies for the medical center. I lead a team of section chiefs, radiologists with various specialties, who set the imaging protocols. By this I mean we develop policies as to what kind of scan is necessary for the clinical question, and whether contrast is needed for that scan. This is done at regular CQI (Continuous Quality Improvement) meetings and on a daily basis for patients whose providers have ordered imaging. We write protocols for CT with contrast and MRI with contrast designed to clearly diagnose necrotizing pancreatitis.

*See generally Decker v. Columbia Med. Ctr. of Plano, Subsidiary, L.P.*, No. 05-19-01508-CV, 2020 WL 6073880, at *3 (Tex. App.—Dallas, October 15, 2020, pet. denied) (expert qualified with background in hospital administration that included "the development, implementation and enforcement of safe, appropriate and efficacious cardiovascular care pathways as well as guidelines and policy development for optimal interventional clinical care for hospital cardiovascular treatment."). Karaman's report and curriculum vitae as outlined above demonstrate he is qualified to opine about the standard of care applicable to MMMC, including policies, procedures, and protocols for diagnosing necrotizing pancreatitis. The trial court reasonably concluded that he has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim, and he is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(2), (3). Karaman is qualified to state the standard of care for MMMC because "his report states he has experience and was involved with the type of claim at issue." *Tex. Children's Hosp. v. Knight*, 604 S.W.3d 162, 172–73 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). Even if this were a close call, "[c]lose calls must go to the trial court." *Larson v. Downing*, 197 S.W.3d 303, 304 (Tex. 2006). The trial court did not abuse its discretion by concluding Karaman is qualified to give the expert report required by section 74.351.

## B. Expert Report Requirements

MMMC contends the expert report does not identify a standard of care (1) applicable to MMMC that would subject it to direct liability or (2) applicable to MMMC's employees that would subject MMMC to vicarious liability.

### 1. Standard of care

We note that Karaman's identification of the standard of care and breaches of that standard of care are set forth in the context of his report that details the factual framework of Hubert's particular case. Karaman's report states that Hubert's "autopsy clearly showed necrotizing pancreatitis." Karaman explains that necrotizing pancreatitis is a very serious condition "with deleterious side effects capable of injuring multiple organ systems. Involvement of more than 30% of the pancreas is often associated with life threatening complications including renal problems, multi-organ system failures, and significantly, lung injury." Adult respiratory distress syndrome (ARDS) is a serious lung injury most often associated with necrotizing pancreatitis. "ARDS associated with necrotizing pancreatitis typically shows less consolidation and more ground glass opacity and faint peripheral opacities on CXR and CT scans."

According to the report, Hubert's medical records reflect that he had a history of hypertension, chronic pancreatitis, coronary artery disease, and asthma. He went to MMMC complaining of abdominal pain and vomiting. In the emergency room, Hubert received a CT scan of the abdomen and pelvis that showed signs of acute

pancreatitis. After a physical examination and diagnostic testing, Hubert was diagnosed with acute pancreatitis without inflammation or necrosis and abdominal pain. He was admitted to the general medical floor of MMMC on August 31, 2017.

Karaman states that the CT scan could not exclude necrotizing pancreatitis because it was performed without contrast. According to the report:

> Evaluation of pancreatic parenchyma is not possible given lack of intravenous contrast. Contrast enhancement helps identify non-necrotic pancreatic tissue and thus helps confirm that there is necrosis where contrast does not enhance the pancreas. Since no contrast was used, the possibility of necrotizing pancreatitis was not excluded by the scan. Any presumption that the pancreatitis was not of the necrotizing type was a guess, and not a finding of the scan obtained. The failure to exclude necrotizing pancreatitis has serious implications on both the quality of care and the outcome of Mr. Yates case of pancreatitis.

Karaman recognizes that CT contrast could not be used because of the condition of Hubert's kidneys: "Mr. Yates had leukocytosis and elevated transaminases and developed ascites and acute kidney injury (AKI)." But Karaman states a safer alternative was available:

> However, in the absence of CT with contrast, MR imaging may also be used to identify necrosis and assess complications, in cases where CT contrast presents a risk. Neither of these imaging modalities were used appropriately to diagnose the severity of Mr. Yates' pancreatitis and its complications.

The report also indicates that Hubert's acute kidney injury and renal failure were clues for necrotizing pancreatitis. The report states that "[c]ontrast could not be used because of renal failure, another complication of necrotizing pancreatitis, which could have been used as a clue to the underlying process."

–13–

Karaman cites to indications of lung abnormalities in the records. Abdominal CT scans performed on September 9 and 19 included a portion of the lungs. The report states:

> The initial study indicated there were early lung changes of patchy ground glass opacities, typical of the pancreatitis associated lung damage of ARDS. The last CT study available also shows lung abnormalities.

Karaman states that chest x-rays on September 15 and 18 still showed lung abnormalities. He continues:

> The only other image of any part of the lung was 9/19/17, the small part of the lung included in the standard abdomen/pelvic CT. This again showed patchy, ground glass changes in the right middle lobe, right lower lobe and left lower lobe.
>
> . . . .
>
> Although the patient was seen by a pulmonologist, no formal evaluation of the chest with a Chest CT scan was performed and no serial Chest X-rays were performed. Mr. Yates received no follow up care with a pulmonologist after September 20, 2017 . . . .

Karaman describes MMMC's standard of care as follows:

> Regarding the care of Hubert Yates, the standard of care of the hospital requires that the hospital maintain policies and procedures guiding the medical care of patients, such as Hubert Yates, including continuous quality improvement meetings. Furthermore, the standard of care requires the hospital maintain protocols regarding discharge and safeguards to ensure a patient requiring multiple disciplines of care have received all necessary care before being discharged from the hospital. A simple policy requiring acute pancreatitis to be characterized as either necrotizing or non-necrotizing by the orderin[g] of appropriate CT or MRI examinations could ensure that the correct diagnsosis [sic.] guides patient management.

–14–

## 2. Breach of the Standard of Care

Intertwined with MMMC's arguments concerning the lack of a standard of care are its arguments that Karaman's statements that MMMC breached the standard of care are conclusory. We disagree. Reading the report as a whole, as we are required to do, the report adequately describes the factual basis for Karaman's opinions. Karaman described MMMC's breach of the standard of care as follows:

> Unfortunately, Methodist Mansfield Medical Center failed to meet the requisite standard of care in caring for Hubert Yates. During his stay, Mr. Yates did not receive appropriate diagnostic testing to ensure the pancreatitis was not necrotizing. As a result, his doctors missed a case of severe necrotizing pancreatitis. His doctors ignored evidence that his lungs were not normal. As a result, Mr. Yates did not receive proper care to monitor and ensure his lung function, failed to get appropriate ICU care and was discharged prematurely. It is widely accepted that early ICU care upon identfication [sic.] of necrotizing pancreatitis improves survival. Specifically, Methodist Mansfield Medical Center breached the standard of care in the following ways:
>
> 1. Failure to discuss with medical providers the rationale for discharge for an unstable patient such as Hubert Yates;
>
> 2. Failure to act as patient's advocate;
>
> 3. Failing to implement a proper and appropriate treatment plan and implement that plan for Hubert Yates;
>
> 4. Failing to have comprehensive coordination of medical care and treatment between its various physicians and medical staff to address the recurrent symptoms expressed by Plaintiffs;
>
> 5. Failing to institute, oversee, and have in place appropriate policies and procedures to guard against the type of injuries and damages sustained by Hubert Yates;
>
> 6. Failing to implement and require a physician diagnosing pancreatitis to prove whether the pancreas is necrotizing;

–15–

7. Failing to provide adequate training, testing and retaining to physicians and medical staff; and

8. Failure to properly oversee, train and supervise physicians and other medical providers who provided medical treatment to Hubert Yates, while he received medical treatment at Mansfield Methodist Medical Center.

According to Karaman, the CT scan performed could not rule out necrotizing pancreatitis because it was not performed with IV contrast. Karaman identified MRI with contrast as a safer alternative because Hubert's kidney function did not allow a CT scan with contrast. Further, Hubert's renal failure was also a clue that his pancreatitis was the more serious necrotizing pancreatitis. Karaman notes that "patchy ground glass opacities, typical of pancreatitis associated lung damage of ARDS," were shown in early abdominal CT scans and continued to be shown in later x-rays. Despite these indications in the medical records, MMMC had no policy in place that required a CT scan or MRI with contrast which would have determined whether Hubert had necrotizing pancreatitis and prevented his discharge from MMMC.

We conclude that Karaman's opinions on the standard of care and breach of the standard of care are sufficiently tied to the facts in the medical records to inform MMMC of the specific conduct called into question and provide a basis for the trial court to conclude the claims have merit. *See Abshire*, 563 S.W.3d at 223.

### 3. Causation

MMMC argues Karaman's report provides no causation opinion regarding MMMC's indirect liability for nurses, hospital employees, supervision, or training. Karaman's only causation opinion, MMMC argues, references his pancreatitis policy. In making this argument, MMMC cites only the last paragraph of Karaman's discussion of causation with respect to MMMC:

> It is my opinion in this case that if the hospital had policies and procedures to ensure patients received comprehensive care prior to discharge and if the doctors in question had completed all necessary diagnostic testing to ensure the correct diagnosis of necrotizing pancreatitis resulting in ARDS, the patient would not have been discharged from the hospital on September 27. As a result, it is my opinion that these breaches in the standard of care caused the demise of Mr. Hubert Yates due to a cardiac event secondary to respiratory arrest.

MMMC agues Karaman's causation opinion fails to explain how and why a Pancreatitis Policy would have prevented (1) Hubert's transfer to Kindred Hospital; or (2) his subsequent death at Kindred Hospital.

MMMC argues further that Karaman fails to explain what difference a necrotizing pancreatitis diagnosis would have made or how and why Mr. Yates would have survived at Methodist but could not survive at Kindred Hospital when he suffered a "cardiac event secondary to respiratory arrest."

In making these arguments, MMMC ignores the lengthy discussion on causation contained in Karaman's report:

> I have reviewed all the imaging studies and medical records provided to me from Mr. Yates' hospitalization of from August 31, 1017 [sic.] through time of demise.

If the above-mentioned named defendant doctors and hospital defendant had recognized and properly diagnosed and done the recommended CT and/or MRI as referred by the radiologist, along with Mr. Yates' clear symptoms of necrotizing pancreatitis, they would have been on notice that Mr. Yates was not ready for discharge on September 26, 2017. A reasonable and prudent physician would not have discharged Mr. Yates without clear indication of the presence of necrosis. The management of pancreatitis begins with proper diagnosis, assessment of severity, and identification of complications. During the early clinical phase, the severity of pancreatitis is determined predominantly by the presence of systemic inflammatory response syndrome and organ failure.

A CT scan with contrast is the best tool to assess a patient for complications resulting from necrotizing pancreatitis, and that necrosis becomes more certain one week after disease becomes more defined. However, in the absence of CT with contrast, MR imaging may also be used to identify necrosis and assess complications, in cases where CT contrast presents a risk. Neither of these imaging modalities were used appropriately to diagnose the severity of Mr. Yates' pancreatitis and its complications.

Necrotizing pancreatitis is a very serious condition with deleterious side effects capable of injuring multiple organ systems. Involvement of more than 30% 0f the pancreas is often associated with life threatening complications including renal problems, multi-organ system failures, and significantly, lung injury. The type of serious lung injury most often associated with necrotizing pancreatitis is ARDS, or adult respiratory distress syndrome. Unlike direct lung injury ARDS, the ARDS associated with necrotizing pancreatitis typically shows less consolidation and more ground glass opacity and faint peripheral opacities on CXR and CT scans. My review of the CT and CXR data includes review of CT scans from 9/9/17, and 9/19/17. These studies of the abdomen included the lower portions of the lungs. The initial study indicated there were early lung changes of patchy ground glass opacities, typical of the pancreatitis associated lung damage of ARDS. The last CT study available also shows lung abnormalities. That is, there in unequivocal evidence that Mr. Yates' lungs were affected by the necrotizing pancreatitis, yet no imaging evidence that these lung changes had cleared prior to his discharge. Chest X-rays, which are less sensitive for lung abnormalities than CT, nevertheless showed abnormalities in the second week of September, including September

–18–

10 and September 11. The CXRS obtained between September 11 and September 15 were not images of Mr. Yates' chest, but rather a low chest/ high abdomen X-ray used to check the position of a nasogastric tube. This shows that the lungs were not being followed, a very surprising deficit in the care of this patient who had demonstrable abnormalities seen in the small area of his lung include on a standard abdominal CT. A CXR completed September 15 did image the chest and showed that there were still lung abnormalities. The next CXR was September 18, and again showed lung abnormalities. Surprisingly, this was the last CXR in the record supplied to me. The only other image of any part of the lung was September 19, the small part of the lung included in the standard abdomen/pelvic CT. This again showed patchy, ground glass changes in the right middle lobe, right lower lobe and left lower lobe.

Significant evidence existed that Mr. Yates suffered necrotizing pancreatitis complicated by lung damage caused by this pancreatitis. The necrotizing nature of Mr. Yates' pancreatitis was not recognized as it developed. This was the result of using a CT done without contrast. Contrast enhancement helps identify non-necrotic pancreatic tissue and thus helps confirm that there is necrosis where contrast does not enhance the pancreas. Contrast could not be used because of renal failure, another complication of necrotizing pancreatitis, which could have been used as a clue to the underlying process. The autopsy clearly showed necrotizing pancreatitis. Lung damage is common with necrotizing pancreatitis. This lung damage was not adequately assessed, followed or treated. With a high degree of medical certainty, the lung complications engendered by necrotizing pancreatitis were under-appreciated, not sufficiently followed by imaging, and contributed to his demise in what was likely a respiratory arrest suffered when discharged from the hospital.

The record does not include a Chest CT, which a careful clinician could use to assess the extent of lung disease cause by necrotizing pancreatitis. The time between the last abdomen CT and discharge shows no evidence that Mr. Yates' physicians looked again at any images of his lungs. The failure to complete a full chest CT at any point in his care and the failure to use serial Chest X-rays to monitor his lung condition indicate with a high degree of medical certainty that his care team failed to appreciate the serious effects his necrotizing pancreatitis had on Mr. Yates' lungs. His death after discharge to Kindred Hospital Mansfield was very likely a respiratory arrest of a patient struggling

–19–

with the temporary lung injury inflicted by a process such as necrotizing pancreatitis. The degree of pancreas injury is consistent with the type of necrotizing pancreatitis which can cause adult respiratory distress syndrome i.e. ARDS. The lack of attention to his lungs represents a breach of the standard of care. Discharging such a patient without being sure that the lungs have cleared, at the very least with a CXR and hopefully by ordering a standard Chest CT, the best test to assess degree of lung injury, contributed significantly to Mr. Yates' risk of death.

Thus, viewing the totality of the Chapter 74 expert report, Karaman offered a causation opinion regarding MMMC's lack of policies, procedures, and protocols relative to comprehensive diagnostic care that also implicates the acts and omissions of its staff.[1] Further, we conclude the report contains sufficient information about the difference a correct diagnosis would have made in Hubert's treatment and outcome. *See Patterson v. Ortiz*, 412 S.W.3d 833, 839 (Tex. App.—Dallas 2013, no pet.) (holding sufficient report stating "that performing the tests and examinations would have led to the diagnosis of pneumonia and [the patient's] admission to the hospital, where he would have received 'early, aggressive treatment [that], more likely than not, would have saved his life'").

An expert report "need not anticipate or rebut all possible defensive theories that may ultimately be presented." *Owens v. Handyside*, 478 S.W.3d 172, 187 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Nor must the report "rule out every possible cause of the injury, harm, or damages claimed." *Baylor Med. Ctr. at*

---

[1] While indirect liability is not addressed in the report with detailed specificity, we note that it is not required at this juncture. An expert report that adequately addresses at least one pleaded liability theory satisfies the statutory requirements. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013).

*Waxahachie v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.);

*see also Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879

(Tex. 2001) (explaining "a plaintiff need not present evidence in the report as if it

were actually litigating the merits . . . . [T]he information in the report does not have

to meet the same requirements as the evidence offered in a summary-judgment

proceeding or at trial").

In determining whether an expert's causation opinion is conclusory, we must

remain mindful that expert-report challenges are made at an early, pre-discovery

stage in the litigation, not when the merits of the health care liability claim are being

presented to the fact finder to determine liability. *Puppala v. Perry*, 564 S.W.3d

190, 198 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Based on the report as a

whole, the trial court could have reasonably determined that the report represented

an objective good faith effort to inform MMMC of the causal relationship between

the breaches of the standard of care and the claimed injury, harm, or damages.

Therefore, we conclude the trial court did not abuse its discretion by overruling

MMMC's objections and denying the motion to dismiss. *See Abshire*, 563 S.W.3d

at 223. We overrule MMMC's issue on appeal.

We affirm the trial court's order denying MMMC's motion to dismiss.

/Bonnie Lee Goldstein/

BONNIE LEE GOLDSTEIN
JUSTICE

210039F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

METHODIST HOSPITALS OF
DALLAS D/B/A METHODIST
MANSFIELD MEDICAL CENTER,
Appellant

No. 05-21-00039-CV V.

CYNTHIA YATES,
INDIVIDUALLY AND AS
REPRESENTATIVE OF THE
ESTATE OF HUBERT YATES,
Appellee

On Appeal from the County Court at
Law No. 2, Dallas County, Texas
Trial Court Cause No. CC-19-07083-
B.
Opinion delivered by Justice
Goldstein. Justices Molberg and
Nowell participating.

In accordance with this Court's opinion of this date, the trial court's order denying the motion to dismiss of Methodist Hospitals of Dallas d/b/a Methodist Mansfield Medical Center is **AFFIRMED**.

It is **ORDERED** that appellee CYNTHIA YATES, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF HUBERT YATES recover her costs of this appeal from appellant METHODIST HOSPITALS OF DALLAS D/B/A METHODIST MANSFIELD MEDICAL CENTER.

Judgment entered January 24, 2022.