**Reversed and Remanded in Part and Affirmed in Part; Opinion Filed April 29, 2022**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00054-CV**

**DONNA VICKERS, INDIVIDUALLY, AS THE REPRESENTATIVE FOR ALL WRONGFUL DEATH BENEFICIARIES, AND AS AN HEIR AT LAW AND REPRESENTATIVE OF THE ESTATE OF JERRY VICKERS, DECEASED, Appellant**

**V.**

**EPIC HEALTH SERVICES, INC., AOC SENIOR HOME HEALTH CORP., D/B/A ANGELS OF CARE AND/OR ANGELS OF CARE PEDIATRIC HOME HEALTH AND AMERIGROUP CORPORATION, Appellees**

**On Appeal from the 298th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-15-14547**

## MEMORANDUM OPINION

Before Justices Reichek, Nowell, and Carlyle
Opinion by Justice Nowell

This is an appeal from an order dismissing health care liability claims for inadequate expert reports under Chapter 74 of the civil practice and remedies code. Appellant argues she timely supplemented the expert reports after the trial court granted an extension and that the reports are sufficient to meet the statutory requirements. We agree that the reports were timely supplemented and conclude the reports are sufficient as to Epic Health Services, Inc. (Epic) and AOC Senior Home

Health Corp. (AOC) but not as to Amerigroup Corporation (Amerigroup). We reverse the trial court's order as to Epic and AOC and remand the claims against those parties to the trial court for further proceedings. We affirm the trial court's order dismissing appellant's claims against Amerigroup.

## Background

We take this background from appellant's expert reports. Donna Vickers's husband, Jerry Vickers, was diagnosed with amyotrophic lateral sclerosis (ALS) in 2010. As the disease progressed, Jerry Vickers could not breathe on his own and could not swallow. By 2013, he was dependent on a ventilator and feeding tube and required complete support for all activities of daily living. He was completely paralyzed by 2014.

Epic began providing home health nursing services to Jerry Vickers in early 2014. Despite his paralysis, Jerry could still blink and was able to communicate with the aid of a computer. He was also able to take and complete online courses. However, in July 2015, Epic unilaterally terminated its services and stopped sending staff to the Vickers's home on July 6, 2015. Donna attempted to obtain adequate skilled home nursing after Epic's termination but was unable to do so. Less than three weeks after Epic's termination, Jerry died.

After Epic terminated its services, Donna contracted with AOC to provide sixty hours per week of skilled nursing care with a start date of July 9, 2015. AOC, however, failed to provide adequate skilled nursing care for Jerry. Several nurses

were selected but they lacked sufficient experience to care for a paralyzed ALS patient.

Amerigroup administered Jerry's Medicaid services. Amerigroup refused to approve a different home health care service with the needed respiratory therapist because that group was out of network. On July 22, 2015, Jerry suffered a cardiac arrest and sustained brain damage. He was declared brain dead on July 28, 2015.

Vickers filed this suit against Epic, AOC, and Amerigroup on December 3, 2015. Vickers timely served Epic and AOC with expert reports and curricula vitae from registered nurses Yvette C. Rodgers-Musial and Mary Beth Geise on the standard of care and breach and from Dr. Peter Gailiunas, Jr on causation. Epic and AOC objected to Gailiunas's reports on the basis that he was not qualified and his reports were insufficient on causation. They did not object to the standard of care and breach of the standard of care reports from the two nurses. Vickers timely served Amerigroup with expert reports and curricula vitae from Dr. Patrick Daly and nurse Geise on August 31, 2016. Amerigroup objected to the qualifications of these experts and to Daly's report as to standard of care and causation.

Epic and AOC contend that the trial court orally granted Vickers a 30-day extension to correct deficiencies in Gailiunas's report at the September 16, 2016 hearing on their objections. At the hearing, the judge stated she was "going to allow you 30 days to correct any deficiencies in the reports" but the judge did not sign a written order at that time. Vickers did not serve a supplemental report within 30 days

–3–

of that hearing but did serve a report and curriculum vitae from Dr. Robert Todd, a neurologist, on December 21, 2016.

Epic and AOC objected to the timeliness of Todd's report and moved to dismiss Vickers's claims against them. Epic also objected to Todd's qualifications and the sufficiency of his report. After a hearing on February 3, 2017, the trial court signed an order granting Epic's motions to dismiss. However, the court vacated this order on March 21, 2018 and signed a written order granting Vickers 30 days to cure any deficiencies in the reports.

Vickers served Epic, AOC, and Amerigroup with a supplemental report from Todd on April 20, 2018. Each of the defendants filed objections to Todd's supplemental report. The trial court dismissed Vickers's claims against Amerigroup at a hearing on August 24, 2018. By an order signed October 26, 2018, the trial court granted Epic's objections to Todd's supplemental report and its motion to dismiss. On December 10, 2019, the trial court signed an order dismissing the claims against AOC, resulting in a final judgment. Vickers then filed this appeal.

**Standard of Review**

We review a trial court's order on a motion to dismiss a health care liability claim based on the sufficiency of an expert's report for an abuse of discretion. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner

without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010).

## Applicable Law

Chapter 74 of the Texas Civil Practice and Remedies Code requires claimants in health care liability cases to serve an expert report on each defendant within 120 days of their answer. TEX. CIV. PRAC. & REM. CODE § 74.351.[1] The report must fairly summarize "the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). The purpose of this requirement "is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire*, 563 S.W.3d at 223.

"Importantly, the trial court need only find that the report constitutes a 'good faith effort' to comply with the statutory requirements." *Id.* (citing TEX. CIV. PRAC. & REM. CODE § 74.351(l)). "[A]n expert report demonstrates a 'good faith effort' when it '(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit.'" *Id.*

---

[1] Section 74.351 was amended effective September 1, 2021, but those amendments apply only to actions commenced after the effective date. *See* Act of April 19, 2021, 87th Leg., R.S., ch. 167, §§ 4–5, 2021 Tex. Sess. Law Serv. Ch. 167 (eff. Sept. 1, 2021). All references to section 74.351 in this opinion are to the section as it existed at the time this action was commenced.

(quoting *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018)). A report "need not marshal all the claimant's proof," but "a report that merely states the expert's conclusions about the standard of care, breach, and causation" is insufficient. *Id.* The "court's job at this stage of the litigation is not to weigh the report's credibility; that is, the court's disagreement with the expert's opinion does not render the expert report conclusory." *Id.* at 226.

In addition, "the expert report must make a good-faith effort to explain, factually, how proximate cause is going to be proven," although the report need not use the words "proximate cause," "foreseeability," or "cause in fact." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). "'[T]he expert must explain the basis of his statements to link his conclusions to the facts.'" *Id.* (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). "[C]ourts must view the report in its entirety, rather than isolating specific portions or sections, to determine whether it includes" the required information. *Baty*, 543 S.W.3d at 694.

To establish a causal relationship between the injury and the defendant's negligent act or omission, the expert report must show the defendant's conduct was a substantial factor in bringing about the harm, and, absent this act or omission, the harm would not have occurred. *Mitchell v. Satyu*, No. 05-14-00479-CV, 2015 WL 3765771, at *4 (Tex. App.—Dallas June 17, 2015, no pet.) (mem. op.). Causation is generally established through evidence of a "reasonable medical probability" that the injury was caused by the negligence of the defendant, meaning that it is more

likely than not that the ultimate harm or condition resulted from such negligence. *See id.* "An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff." *Id.* The report must explain "to a reasonable degree, how and why the breach [of the standard of care] caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 539–40; *see also Quinones v. Pin*, 298 S.W.3d 806, 814 (Tex. App.—Dallas 2009, no pet.) (to satisfy Chapter 74's causation requirement, expert report must include fair summary of expert's opinion regarding causal relationship between breach of standard of care and injury, harm, or damages claimed). "We determine whether a causation opinion is sufficient by considering it in the context of the entire report." *Mitchell*, 2015 WL 3765771, at *4 (internal quotation omitted).

## Analysis

### A. Epic and AOC

In her first issue, Vickers argues that the trial court abused its discretion by granting Epic's and AOC's objections and motions to dismiss.

#### 1. Timeliness

The first matter we must address is the timeliness of the expert reports. Epic and AOC argue the trial court orally granted a 30-day extension at the September 16, 2016 hearing and Todd's expert reports were not served within that time.

A claimant in a health care liability claim must serve an expert's report and curriculum vitae on each defendant within 120 days after the defendant answers the

–7–

suit. TEX. CIV. PRAC. & REM. CODE § 74.351(a). The defendant must file and serve any objections to the sufficiency of the report within 21 days after the date the report is served or the date the defendant answered the suit, whichever is later. *Id*. If the report is found deficient, the trial court may grant the claimant one 30-day extension to cure the deficiencies. *Id*. § 74.351(c). "If the claimant does not receive notice of the court's ruling granting the extension until after the 120-day deadline has passed, then the 30-day extension shall run from the date the plaintiff first received the notice." *Id.*

The trial court conducted a hearing on Epic's and AOC's objections on September 16, 2016. After the attorneys completed their arguments, the court stated the following:

> THE COURT: Thank you. I'm going to allow you 30 days to correct any deficiencies in these reports. I think you know from some of the questions I've asked and some of the responses you've received pretty much what those are. So, you know, get your 30 days, and we'll see where we are.

Vickers's attorney asked, "Do you want us to give you anything? Do you want us to give you copies of the order, or do you have that?" The judge responded, "Yes. If you have an order, if you will please circulate it to counsel." AOC's counsel then asked if "the 30 days is as to both defendants who have motions pending today?" The court confirmed that it did.

The parties were unable to agree on the form of a written order following the hearing and submitted competing proposed orders to the court. The court, however, did not sign an order at that time.

On December 21, 2016, Vickers served Epic and AOC with Todd's expert report on causation and his curriculum vitae. Epic objected to Todd's report on January 10, 2017, contending the report was not timely, Todd was not qualified, and his report was insufficient on causation. On January 11, 2017, AOC moved to dismiss on the basis that Todd's report was not timely filed.

On February 3, 2017, the trial court signed an order granting Epic's motions to dismiss and dismissing Vickers's claims against Epic. Vickers moved to vacate that order on February 10, 2017. On March 21, 2018, the trial court signed a written order vacating the February 3, 2017 order and granting Vickers 30 days to correct any deficiencies in the reports.[2] Vickers served supplemental reports from Todd on each of the defendants on April 20, 2018.

Epic and AOC argue that the context of the trial court's statement at the September 16, 2016 hearing indicates a present decision to grant a 30-day extension from the date of the hearing. We disagree. "A trial court renders judgment orally when it announces rendition as a present act and not as an 'intention to render

_____

[2] On October 26, 2018, the trial court signed an order clarifying that this order sustained Epic's objections to Todd's December 2016 report, granted Vickers 30 days from March 21, 2018 to correct any deficiencies in Todd's report, and vacated the February 3, 2017 order dismissing Vickers's claims with prejudice.

–9–

judgment in the future.'" *State v. Naylor*, 466 S.W.3d 783, 788 (Tex. 2015) (quoting *S & A Rest. Corp. v. Leal*, 892 S.W.2d 855, 858 (Tex. 1995) (per curiam)). The words used by the trial court must clearly indicate the intent to render judgment at the time the words are expressed. *Leal*, 892 S.W.2d at 858.

Here, the court stated she was "going to allow" Vickers 30 days, indicating a future action. When specifically asked about an order, the court responded, "Yes. If you have an order, will you please circulate it to counsel." This indicates the court expected to sign a written order circulated and approved by counsel. We conclude the trial court did not grant an extension from the date of the hearing, but indicated she was "going to allow" Vickers 30 days after a written order to correct any deficiencies in the report. *See Mem'l Hermann Health Sys. v. Heinzen*, 584 S.W.3d 902, 908–09 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (holding oral statements "I will give you 30 days" and "I'm going to go ahead and grant the objections and give you 30 days, and I'll—I'll sign the order" expressed the court's intention to grant an extension in the future); *Lopez v. Brown*, 356 S.W.3d 599, 602–03 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("[T]he notice [of the court's ruling] provided for in section 74.351(c) must be in the form of a written order, rather than a trial court's mere oral pronouncement from the bench."). Vickers served Todd's December 2016 report in anticipation of a written order granting her a 30-day extension and was timely when that order was later signed on March 21, 2018. Vickers then served Todd's supplemental report on April 20, 2018, within 30 days

of the order granting the extension. We conclude that both of Todd's reports were timely.

## 2. Qualifications

Vickers argues the trial court abused its discretion by concluding that Todd was not qualified to give an opinion on causation.

To qualify as an expert witness on the issue of cause of injury, harm, or damages in a health care liability claim, an expert must be "a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5)(C). Likewise, under section 74.403(a), "a person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence." *Id.* § 74.403(a). Texas Rule of Evidence 702 requires an expert witness to be qualified on the basis of "knowledge, skill, experience, training, or education." TEX. R. EVID. 702. In determining whether an expert is qualified to give a Chapter 74 report, we consider only the four corners of the expert report and the curriculum vitae. *See Abshire*, 563 S.W.3d at 223; *Heinzen*, 584 S.W.3d at 916.

According to his report and curriculum vitae, Todd is board certified in neurology and a diplomate of the American Board of Psychiatry and Neurology. He is licensed in New York and has been practicing for nineteen years. He received one

year of training in internal medicine and three years of training in neurology. He states he was trained to care for ALS patients with pulmonary diseases and treats ALS patients in his practice, all of whom have pulmonary diseases. He treats "ALS patients with severe pulmonary problems such as respiratory dependent patients like Jerry Vickers."

Todd explained:

> There is no such thing as an amytropic lateral sclerosologist. Patients with ALS are treated symptomatically by specialists who are experts in whatever organ system is most affected by their ALS. In Mr. Vickers' case the life-threatening condition I was asked to report on involved his pulmonary care. Patients who cannot breathe on their own and are on full time ventilator support need around the clock minute by minute pulmonary support to survive. Since I have been responsible for and taken care of many patients who are completely ventilator dependent, I am familiar with the standard of care both with hospitalized patients and home healthcare patients who are completely ventilator dependent.

Epic and AOC contend this paragraph shows that Todd is not qualified because he is not a pulmonologist. However, the proper inquiry concerning whether a physician is qualified to testify is not the physician's area of practice but the stated familiarity with the issues involved in the claim before the court. *Pediatrix Med. Group, Inc. v. Robinson*, 352 S.W.3d 879, 883–84 (Tex. App.—Dallas 2011, no pet.). Todd's report shows his familiarity with the pulmonary problems of ventilator-dependent ALS patients and describes his specialized knowledge of the pulmonary hygiene required to keep such patients healthy. Todd is a neurologist treating ALS patients, like Jerry Vickers, who are completely ventilator dependent. He is familiar

with the standard of care for both hospitalized and home health care patients who are completely ventilator dependent. *See Whisenant v. Arnett*, 339 S.W.3d 920, 927–28 (Tex. App.—Dallas 2011, no pet.) (anesthesiologist qualified on causation in claim that defendant anesthesiologist failed to remove portion of broken needle after discography procedure causing wound infection); *Adeyemi v. Guerrero*, 329 S.W.3d 241, 247 (Tex. App.—Dallas 2010, no pet.) (although not every physician is qualified to testify on every medical question, "we must be careful not to draw expert qualifications too narrowly"); *Livingston v. Montgomery*, 279 S.W.3d 868, 875–76 (Tex. App.—Dallas 2009, no pet.) (OB/GYN qualified to give opinion on standard of care and causation in case alleging defendants' negligence during labor and delivery caused neurological injuries to child).

Epic and AOC next contend that Todd's reports do not show he has specialized knowledge on the pulmonary problems faced by ALS patients. We cannot agree. Todd's reports detail his specialized knowledge about the breathing process and the pulmonary hygiene necessary to keep a ventilator-dependent person alive and healthy. He explained:

> The human lungs are not simply a bellows whereby air comes in and air goes out. Much more happens during the breathing cycle. The air passages (or bronchial tubes) are lined with tiny hair-like structures called cilia. The mucosa lining these air passages secretes mucus. When a breath is taken in, more than air enters the lungs. There are bacteria, microscopic particles, and foreign debris which also enter the air passages. The mucus traps these before they can enter the air sacks (alveoli). They are then removed passively by gravity and as we change positions, and actively by the cilia moving the debris up and out of the

lungs. These processes, along with us coughing, occasionally deep breathing, and clearing our throat, work together to keep our lungs healthy. Mr. Vickers could not do any of the above actions on his own. He had to rely on external sources to remain alive. This included a ventilator which forced air into and out of his lungs 24 hours a day 7 days a week. However, it takes much more than that to keep a person alive and healthy who is ventilator dependent. It requires around the clock pulmonary hygiene (cleansing or toilet). Let me describe what this entails.

1. Postural drainage and percussion. This means they frequently repositioned the patient at least every 2 hours. They also beat on his back and his chest to loosen his secretions. This prevents pooling of debris in the lungs.

2. They put saline down the tracheostomy tube and into his lungs. They used a cough assistance device and they suctioned the saline from his lungs which loosened the secretions and brought them out. This prevents obstruction of the bronchi which lead to atelectasis and pneumonia.

3. They gave him IPPB treatments. This is done with a ventilator and is intermittent positive pressure breathing treatments. It gives the patient deep breaths and keeps the alveoli open.

4. They did tracheostomy care. This involves cleaning and sterilizing around the tracheostomy opening to prevent infections which would spread into his lungs.

5. Other treatments on a PRN basis as ordered by his pulmonary doctors.

6. They got him out of bed and into a chair several times a day. They also changed his position in the bed. This helped his circulation, and it helped to keep his lungs clear.

The above treatments were done on a very regular basis at least two to three times per shift and sometimes more often depending on his condition at that time.

The central question in determining whether an expert is qualified is whether

the expert has "knowledge, skill, experience, training, or education regarding the

specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Broders v. Heise*, 924 S.W.2d 142, 153 (Tex. 1996). Epic's and AOC's alleged failure to provide skilled nurses to perform this pulmonary hygiene for up to 60 hours a week is the crux of Vickers's claim against them. Reading Todd's reports and curriculum vitae as a whole shows he has the necessary knowledge, skill, experience, and training to render an opinion on causation in this case. Accordingly, the trial court abused its discretion to the extent it sustained Epic's and AOC's objections to Todd's qualifications.

### 3. Causation

Vickers next argues the trial court abused its discretion by sustaining Epic's and AOC's objections to Todd's reports on causation. She contends that Todd's reports adequately explain how and why Epic's and AOC's breaches of the standard of care proximately caused Jerry Vickers's death.

Epic and AOC did not object to the sufficiency of the reports as to the standard of care and breach of the standard. Thus, the only question is whether Todd's reports represent a good faith effort to provide a fair summary of his opinion regarding the causal relationship between the breach of the standard of care and the alleged injury. *See Quinones*, 298 S.W.3d at 814.

Nurse Rodgers-Musial explained the standard of care for Epic and AOC regarding Jerry Vickers's pulmonary care. His respiratory muscles were completely paralyzed and he required ventilator support 24 hours a day for seven days a week.

–15–

To prevent infections and mucous plugs, he was given pulmonary cleansing several times a day. Epic nurses were trained to perform these skilled nursing functions and performed them while they were on duty. AOC nurses were trained to perform these services but did not perform them. According to Rodgers-Musial, Epic and AOC nurses were required to perform these functions sixty hours a week. Donna Vickers was responsible for these activities the rest of the time. Rodgers-Musial stated that these activities are so difficult and time consuming that no one person can constantly perform them no matter how hard they work or well-meaning they are.

Rodgers-Musial explained the breach of the standard of care as to Epic and AOC. Both had a contractual duty to provide sixty hours of skilled nursing to Jerry Vickers. If Epic could no longer perform and AOC was unable to perform "their required duty, they were required to give Mrs. Vickers due notice in writing and an ample opportunity to secure the presence of other medical attendees who were qualified to provide Mr. Vickers essential care." Her report also states, "Further, if Epic terminated their services to this critically ill patient, they were required to secure another in home nursing service capable of caring for a paralyzed ALS patient." Epic's breaches included the unilateral termination of their services without adequate notice as required by law and "failure to provide subsequent services to a critically ill patient when there was a necessity for constant, continuing medical attention."

Regarding AOC, Rodgers-Musial stated that Jerry Vickers did not receive the care AOC contracted to provide. "Several nurses were selected who lacked sufficient experience to care for a paralyzed ALS patient. By the time Angels of Care could provide a possibly suitable candidate, Mr. Vickers suffered a cardiac arrest and required emergency hospitalization." AOC's breaches included the unilateral severance of their services without adequate notice or "provision of adequate care" as required by law and "failure to provide satisfactory services to a critically ill patient when there was a necessity for constant, continuing medical attention."

Todd's causation opinions begin with the breaches of the standard of care described in the nurse reports. He stated that Epic stopped going to the Vickers's home on July 6, 2015 and did not inform the Vickers of their unilateral termination of services as required by law. Further, they failed to obtain competent follow-up care as also required by law. "Were it not for these acts Mr. Vickers would have continued to receive his pulmonary hygiene and other vital services." Further, Todd stated that AOC did not provide competent home health care services. AOC sent staff to the Vickers's home "a couple of times" but they stayed only a few hours and were unable to perform the "pulmonary hygiene necessary to keep Mr. Vickers's lungs clear." "Were it not for [AOC's] failure to provide competent staff Mr. Vickers would have continued to receive his pulmonary hygiene and other vital services."

Todd's reports explained the results:

Therefore, over the next 2 to 3 weeks' mucus, bacteria, and foreign

–17–

debris began to build up in his lungs. This led to a cascade of complications.

First, the bronchi (breathing tubes) will not allow enough air to pass in and out of the alveoli. This leads to atelectasis which is a collapse of the lung tissue distal to the obstruction. In the atelectatic part of the lung pneumonitis forms because of bacteria within this closed space. Eventually, the amount of air reaching Mr. Vickers' alveoli and diffusing into his bloodstream did not supply enough oxygen to keep vital tissues alive. In Mr. Vickers' case this progression took about 2 plus weeks. On the morning of Mr. Vickers cardiac event, based on reasonable medical probability, a mucus plug had formed and the oxygen level reaching his heart dropped too low and he suffered a fatal arrhythmia or a cardiac arrest. It was not apparent to Mrs. Vickers from his general condition that the cardiac arrest was imminent, but while receiving a breathing treatment on the morning of July 22 he suddenly became unresponsive. If Mrs. Vickers would have recognized Mr. Vickers' deterioration, she would have had him hospitalized before this event. However, she was not a trained professional healthcare provider and did not recognize the serious nature of his condition. After 2 plus weeks of less than adequate pulmonary hygiene it only look a minimal decrease in his PO2 (oxygen level in his blood) to cause his heart muscle to cease functioning efficiently.

. . . .

The cause of Mr. Vickers' death was anoxic brain injury. He suffered this during his cardiac arrhythmia and/or cardiac arrest which occurred as a result of his pulmonary deterioration. The pulmonary deterioration occurred because of the lack of effective professional pulmonary hygiene over the 2 weeks prior to his arrest. It is my fervent opinion, based on reasonable medical probability, that Mr. Vickers would have lived considerably longer, and the family and he would be happy, and he would be productive if Epic Home Healthcare had continued to care for him 60 hours a week. It is unquestionably foreseeable that when Epic abandoned Mr. Vickers and did not secure competent follow up care his pulmonary condition would deteriorate, and this would and did lead to his cardiac arrest and his brain death.

Todd expressed a similar opinion as to AOC:

It is my fervent opinion that, based on reasonable medical probability,

–18–

that Mr. Vickers would have lived considerably longer, and the family and he would be happy, and he would be productive if Angels of Care had provided him with well trained, competent staff, who could have done the required pulmonary and other services. It is unquestionably foreseeable that when Angels of Care failed to provide the above described competent care Mr. Vickers pulmonary condition would deteriorate, and this would and did lead to his cardiac arrest and his brain death.

Reading the reports together, they provide a straightforward link between the breaches of the standard of care and the injury. Jerry Vickers could not survive without the pulmonary hygiene services both Epic and AOC contracted to provide to him. Jerry Vickers did not receive the necessary pulmonary hygiene during the two weeks leading to his death because Epic stopped providing it and AOC did not provide qualified nurses to perform it. Without adequate pulmonary hygiene, mucus, bacteria, and foreign debris began to build up in Jerry Vickers's lungs resulting in insufficient oxygen to keep his vital tissues alive. In Todd's opinion, a mucus plug formed and the oxygen level reaching his heart dropped too low, leading to a cardiac event and eventually to brain death.

Epic argues that it was not required to provide care to Jerry Vickers in perpetuity and that it could have been released from its obligations by complying with the Texas Administrative Code provisions. Epic also argues nothing in the reports shows that it had knowledge of AOC's alleged inability to provide competent nursing services. But these arguments go to the standard of care and breach of that standard, not causation. The causation question is whether Epic's failure to properly

terminate its services and obtain competent follow-up care caused Vickers's injury. Epic did not object to the reports on standard of care and breach of the standard, therefore we accept that it failed to properly terminate its services and to secure a competent home health service to provide adequate nursing care to Jerry Vickers. Further, Vickers does not contend that Epic was required to provide services forever, only that it was required to provide services until it properly terminated its services and obtained competent follow-up care to keep Jerry Vickers alive.

Epic points to factual discrepancies between the reports as to when it stopped providing services and when AOC began services. But it is improper at this early stage of the litigation to consider the "quality of the evidence the experts used as the basis for their factual assumptions." *Aramada v. Yates*, No. 05-20-00960-CV, 2021 WL 5563763, at *9 (Tex. App.—Dallas Nov. 29, 2021, no pet.) (mem. op.) (quoting *Quinones*, 298 S.W.3d at 813). In essence, Epic contends Todd's opinion is not credible because Epic's conduct was too remote from Jerry Vickers's death. But the supreme court has made clear that the reasonableness, believability, credibility, or weight of an expert's report are not relevant at this preliminary stage of the litigation. *Abshire*, 563 S.W.3d at 226 ("[T]he court's job at this stage of the litigation is not to weigh the report's credibility; that is, the court's disagreement with the expert's opinion does not render the expert report conclusory."); *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 516–17 (Tex. 2017) (per curiam) ("At

this preliminary stage, whether those standards appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort.").

AOC argued in the trial court that Todd's second report was conclusory because it did not explain why Jerry Vickers's death was not primarily caused by the natural progression of his ALS and did not discuss the most reasonable alternative cause of death. But a Chapter 74 expert report is not required to exclude all other possible causes or anticipate and rebut all defensive theories. *See Aramada*, 2021 WL 5563763, at *9; *Owens v. Handyside*, 478 S.W.3d 172, 187 (Tex. App.— Houston [1st Dist.] 2015, pet. denied). Nor must the report "rule out every possible cause of the injury, harm, or damages claimed." *Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.). The expert need not prove the entire case or account for every known fact; the report is sufficient if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven." *Abshire*, 563 S.W.3d at 224 (quoting *Zamarripa*, 526 S.W.3d at 460). Todd's reports satisfy this standard. Moreover, the reports show that when he was receiving adequate services from Epic, Jerry Vickers did well and was essentially stable.

We conclude Todd's reports represent a good faith effort to explain factually how proximate cause will be proven as to Epic and AOC. *See Zamarripa*, 526 S.W.3d at 460. The trial court abused its discretion by sustaining Epic's and AOC's objections. We sustain Vickers's first issue.

## B. Amerigroup

Vickers's last three issues concern the dismissal of her claims against Amerigroup.

Initially, Vickers argues she was not required to satisfy the Chapter 74 expert report requirements because Chapter 74 does not apply to her claim against Amerigroup. We disagree.

Vickers alleged in her petition that Jerry was enrolled in the Texas Medicaid program administered by Amerigroup. She also alleged that Amerigroup "failed to make timely and reasonable health-care treatment decisions of the treatment of Jerry Vickers." Chapter 88 of the civil practice and remedies code applies to claims against managed care entities. *See* TEX. CIV. PRAC. & REM. CODE § 88.001(8). It provides: "A . . . managed care entity for a health care plan has the duty to exercise ordinary care when making health care treatment decisions and is liable for damages for harm to an insured or enrollee proximately caused by its failure to exercise such ordinary care." *Id*. § 88.002(a). "Ordinary care" means, in the case of a managed care entity, "that degree of care that a . . . managed care entity of ordinary prudence would use under the same or similar circumstances." *Id*. § 88.001(10). Chapter 88 provides that an enrollee who files an action under that chapter must comply with the requirements of section 74.351 as it relates to expert reports. *Id*. § 88.002(k). Because Vickers asserted a claim under Chapter 88, she was required to comply with the expert report requirements of section 74.351. *Id*.

Next, Vickers contends that Todd's supplemental report regarding Amerigroup was sufficient to satisfy the section 74.351 requirements. She contends Todd's report shows he is qualified to opine on the standard of care for a Medicaid managed care organization. Todd's report states:

> With particular regard to Amerigroup's conduct, I have interacted with insurance company and third-party administrators in complex cases like Jerry Vickers. Many times, I have had the opportunity to correspond with such persons as an advocate for my patients in persuading case managers of the medical necessity of treatment. I have worked with many case managers in developing care plans for complex cases, such as the one presented by Jerry Vickers' case. Through this substantial interaction, I am familiar with the standards of care for case managers, who are charged with sometimes conflicting duties to balance the need for care with the expense of such treatment. Ultimately, case managers are medical professionals, bound to the bottom-line duty of all healthcare workers, to "do no harm." Case management professionals in a Medicare managed care organization also have specific duties of care imposed upon them by statute and regulation, and I have familiarized myself with such regulatory standards of care which are set forth herein. Finally, I reviewed materials from Amerigroup itself, to determine its self-imposed duties and standards of care for the provision of case management services to patient/members. After review of all of these materials, I can unequivocally state that I am able to discern and opine about the standard of care for the case management professionals in Jerry Vickers' case.

Todd's report indicates that he has interacted with insurance companies and third-party administrators from the perspective of a physician advocating for his patients but does not address Vickers's claim from the standpoint of a Medicaid managed care organization. He does not explain why his medical experience qualifies him as an expert on the standards applicable to a Medicaid managed care organization under the same or similar circumstances.

Just as "[m]erely working at a hospital and serving on hospital committees does not automatically qualify an expert to testify on matters of operating a hospital," *Nacogdoches Cty. Hosp. Dist. v. Felmet*, No. 12-12-00393-CV, 2013 WL 6207838, at *4 (Tex. App.—Tyler Nov. 26, 2013, no pet.) (mem. op.), merely interacting with insurance companies and third-party administrators does not qualify Todd to testify as an expert on managed care entities. Todd does not indicate he has any experience, training, or expertise working for a managed care organization or identifying and applying standards of care for such organizations. *See Tenet Hospitals Ltd. v. Love*, 347 S.W.3d 743, 750–51 (Tex. App.—El Paso 2011, no pet.) (holding physician expert failed to demonstrate qualifications to opine on hospital administration procedures regarding staffing physician specialists and transferring patients). Neither the report nor the curriculum vitae indicate Todd is qualified to opine on the degree of care that a managed care entity of ordinary prudence would use under the same or similar circumstances.

We conclude the trial court did not abuse its discretion in concluding that Todd was not qualified as an expert as to a Medicaid managed care organization such as Amerigroup. Accordingly, the trial court did not err by granting Amerigroup's motion to dismiss.

In the alternative, Vickers contends the trial court should have abated the case pursuant to section 88.003(e), which provides that the court in its discretion may order the parties to nonbinding dispute resolution and abate the action for no more

than thirty days. TEX. CIV. PRAC. & REM. CODE § 88.003(e). Subsection (e) however, is subject to subsection (f), which precludes abatement if the plaintiff has filed a pleading alleging that "harm to the enrollee has already occurred because of the conduct of the . . . managed care entity" and review "would not be beneficial to the enrollee." *Id*. § 88.003(f). Here, Vickers alleged that: "As to Defendant Amerigroup Corporation, harm has already been caused by Defendant's negligent conduct in the form of Jerry Vicker's [sic] death and a review would not be beneficial to Plaintiff." Accordingly, Vickers was not entitled to an abatement.

In her third and fourth issues, Vickers argues that Chapter 74 is preempted by federal law because Amerigroup is a Medicaid payor and that the trial court erred by denying her motion for class certification of her claims against Amerigroup.

After the trial court dismissed her claims against Amerigroup, Vickers filed a second amended petition alleging Amerigroup failed to comply with its obligations under federal law as a Medicaid managed care organization and seeking to certify a class action against Amerigroup. She also raised the preemption argument in her motion for rehearing of the court's order dismissing Amerigroup. The trial court denied the motion for rehearing and confirmed its August 24, 2018 ruling dismissing Vickers's claims against Amerigroup with prejudice.

According to her brief, "Appellant filed suit against Amerigroup asserting Chapter 74 health care liability claims that led to the untimely death of her husband." She now argues this claim was preempted by federal law and that Amerigroup failed

to comply with its obligations under federal law as set forth in her second amended petition. She also argues the trial court erred by denying her request for class certification that was raised in her second amended petition. However, Vickers did not file the second amended petition until after the trial court dismissed her claims against Amerigroup with prejudice. Because the second amended petition was not filed until after the trial court dismissed Vickers's claim against Amerigroup with prejudice, the petition was not properly before the court.

A trial court cannot grant leave to amend pleadings after it has rendered judgment. *See Midwest Compressor Sys. LLC v. Highland Imperial, Inc.*, No. 05-19-01115-CV, 2021 WL 2548712, at \*5 (Tex. App.—Dallas June 22, 2021, pet. denied) (mem. op.) (holding court did not abuse its discretion by denying motion to amend pleading filed after court pronounced it granted directed verdict); *Rodriguez v. Crutchfield*, 301 S.W.3d 772, 775 (Tex. App.—Dallas 2009, no pet.) ("[I]t is too late to amend the pleadings after judgment has been rendered."); *Prater v. State Farm Lloyds*, 217 S.W.3d 739, 741 (Tex. App.—Dallas 2007, no pet.) ("A trial court cannot grant a motion to amend the pleadings once the court renders judgment."). Thus, the trial court did not abuse its discretion by rejecting Vickers's preemption argument and her motion for class certification.

We overrule Vickers's second, third, and fourth issues.

## Conclusion

We conclude the trial court abused its discretion by granting Epic's and AOC's objections to Vickers's expert reports. We also conclude the trial court did not abuse its discretion by granting Amerigroup's objections to the expert reports. Accordingly, we reverse the trial court's orders granting Epic's and AOC's objections and motions to dismiss and remand the claims against those parties to the trial court for further proceedings. We affirm the trial court's order dismissing Vickers's claims against Amerigroup.

/Erin A. Nowell//
ERIN A. NOWELL
JUSTICE

200054f.p05

–27–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DONNA VICKERS,
INDIVIDUALLY, AS THE
REPRESENTATIVE FOR ALL
WRONGFUL DEATH
BENEFICIARIES, AND AS AN
HEIR AT LAW AND
REPRESENTATIVE OF THE
ESTATE OF JERRY VICKERS,
DECEASED, Appellant

No. 05-20-00054-CV          V.

EPIC HEALTH SERVICES, INC.,
AOC SENIOR HOME HEALTH
CORP., D/B/A ANGELS OF CARE
AND/OR ANGELS OF CARE
PEDIATRIC HOME HEALTH AND
AMERIGROUP CORPORATION,
Appellees

On Appeal from the 298th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-15-14547.
Opinion delivered by Justice Nowell.
Justices Reichek and Carlyle
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. The trial court's October 26, 2018 order sustaining defendant Epic Health Services, Inc.'s objections to plaintiff's supplemental chapter 74 expert report and granting defendant's motion to dismiss and the December 10, 2019 order granting defendant Angels of Care/Angels of Care Pediatric Home Health's objections to Robert E. Todd's Chapter 74 Report and motion to dismiss are **REVERSED**. The August 24, 2018 and November 16, 2018 orders dismissing appellant's claims against Amerigroup Texas, Inc. are **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellant Donna Vickers, individually, as the representative for all wrongful death beneficiaries, and as an heir at law and representative of the estate of Jerry Vickers, deceased, recover her costs of this appeal from appellees Epic Health Services, Inc. and AOC Senior Home Health Corp., d/b/a Angels of Care and/or Angels of Care Pediatric Home Health. It is further **ORDERED** that appellee Amerigroup Texas, Inc. recover its costs of this appeal from appellant Donna Vickers individually, as the representative for all wrongful death beneficiaries, and as an heir at law and  representative of the estate of Jerry Vickers, deceased.

Judgment entered this 29th day of April, 2022.